## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DEISY JAIMES, ENRIQUE JAIMES, and GLORIA JAIMES, | ) | |
| | ) | Case No. |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COOK COUNTY, SHERIFF OF COOK COUNTY THOMAS J. DART, the COOK COUNTY DEPARTMENT OF CORRECTIONS, EXECUTIVE DIRECTOR OF CCDOC CARA SMITH, EXECUTIVE DIRECTOR OF CCDOC NNEKA JONES, 1st ASSISTANT EXECUTIVE DIRECTOR OF CCDOD GEORGE TURNER, SUPERINTENDENT JEFF K. JOHNSEN, SERGEANT PHILLIPS (#1209), SERGEANT MONROE, LIEUTENANT J. PETERSON (#191), UNKNOWN SERGEANT (#3010), UNKNOWN SERGEANT (#135), and the ESTATE OF ERIKA AGUIRRE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiffs Deisy Jaimes, Enrique Jaimes, and Gloria Jaimes, through their attorneys, Loevy & Loevy, and complaining of Defendants County of Cook, the Sheriff of Cook County Thomas J. Dart, the Cook County Department of Corrections, the Executive Director of the Cook County DOC Cara Smith, the Executive Director of the Cook County DOC Dr. Nneka Jones, 1st Assistant Director of the Cook County DOC George Turner, Superintendent Jeff K. Johnsen, Sergeant Phillips, Sergeant Monroe, Lieutenant J. Peterson, Unknown Sergeant (Badge

#3010), Unknown Sergeant (Badge #135), and the Estate of Erika Aguirre, allege as follows:

## Introduction

1.    On November 15, 2015, Cook County Jail Correctional Officer Erika Aguirre broke into the home of the Jaimes family and attempted to murder them. As part of this brutal attack, Deisy Jaimes was shot six times, including in the left eye, and suffers permanent brain damage. Enrique Jaimes was shot twice, including through the spine, leaving him unable to walk without assistance. Gloria Jaimes and the rest of the Jaimes family managed to flee the home and were lucky to escape with their lives.

2.    To carry out her methodical attack, Officer Aguirre used the semi-automatic service weapon she was authorized to carry as a Cook County Jail correctional officer.

3.    Sadly, this attack should have been prevented. Officer Aguirre was not mentally or emotionally fit to serve as a deputized employee of the Cook County Sheriff's Office, let alone fit to be authorized to carry a gun.

4.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 to hold Defendants accountable for their actions and failures to act, and to redress the grave injuries inflicted upon Plaintiffs in violation of their rights as secured by the United States Constitution and the laws of the State of Illinois.

## Jurisdiction and Venue

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1367.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein all occurred within the judicial district, Defendant Cook County is a municipal corporation located here, and most or all of the parties reside in this district.

## The Parties

7.      Plaintiff Deisy Jaimes is a 29-year-old resident of Cook County, Illinois, and the daughter of Enrique and Gloria Jaimes.

8.      Plaintiff Enrique Jaimes is a 54-year-old resident of Cook County, Illinois. He is the devoted husband of Gloria Jaimes, and a beloved father to Deisy Jaimes and four additional children.

9.      Plaintiff Gloria Jaimes is a 49-year-old resident of Cook County, Illinois. She is the devoted wife of Enrique Jaimes, and a beloved mother to Deisy Jaimes and four additional children.

10.      Defendant County of Cook ("Cook County") is a county within the State of Illinois. It is responsible for indemnifying the Cook County Sheriff and his employees.

11.      Defendant Cook County Sheriff Thomas J. Dart, in his official capacity, is the Chief Law Enforcement Officer in Cook County. Under the provisions of the Illinois State Constitution and Illinois law, the Sheriff is responsible for overseeing and operating Defendant the Cook County Department of Corrections.

12.     At all times relevant to the events at issue in this case, Defendant Cook County Sheriff Dart was an elected official acting in the capacity of Sheriff. As such, Defendant Cook County Sheriff Dart was acting under color of law.

13.     Defendant the Cook County Department of Corrections ("Cook County Jail") is a division of, and operated by, the Cook County Sheriff's Office.

14.     At all times relevant to the events at issue in this case, Defendant Cook County Sheriff Dart promulgated rules, regulations, policies, and procedures as Sheriff for the training, supervision, and discipline of Cook County Jail correctional officers with respect to, among other things: (1) staff conduct, including disorderly conduct and official misconduct; (2) the use of force; (3) the use of force alert and early intervention program; (4) the use of force data collection and review program; (5) staff discipline; (6) remedial training; (7) reassignment; (8) referral to counseling/therapy (i.e., the Employee Assistance Program); (9) requests for fitness for duty examinations; (10) authorization to carry a service weapon; and (11) securing department authorized firearms.

15.     At all times relevant to the events at issue in this case, Defendant Cook County Sheriff Dart, as the Sheriff of Cook County, was the final policymaker for the Cook County Sheriff's Office and for the Cook County Jail.

16.     Defendant Cook County Sheriff Dart is sued in his individual and official capacities.

17.     At all times relevant to the events at issue in this case, Defendants Cara Smith and Dr. Nneka Jones were employed by the Cook County Sheriff's

Office as Executive Director of the Cook County Jail. As such, Defendants Smith and Jones were acting under color of law.

18.     At all times relevant to the events at issue in this case, Defendant George Turner was employed by the Cook County Sheriff's Office as the 1st Assistant Executive Director of the Cook County Jail. As such, Defendant Turner was acting under color of law.

19.     At all times relevant to the events at issue in this case, Defendant Jeff K. Johnsen was employed by the Cook County Sheriff's Office as the Superintendent of the Receiving, Classification, and Diagnostic Center of the Cook County Jail. As such, Defendant Johnsen was acting under color of law.

20.     At all times relevant to the events at issue in this case, Defendants Sergeant Phillips, Sergeant Monroe, Lieutenant J. Peterson, Unknown Sergeant (Badge #3010), and Unknown Sergeant (Badge #135) were employed by the Cook County Sheriff's Office and worked at the Cook County Jail. As such, these Defendants were acting under color of law.

## Factual Allegations

### A. November 15, 2015 Shooting

21.     In November 2015, Enrique and Gloria Jaimes lived in Bridgeview, Illinois with their children Deisy, Cassandra, Marina, Jason, and Henry.

22.     Enrique enjoyed a career working as a carpenter while Gloria spent her time raising their children as a stay-at-home mother. Deisy worked as an

assistant manager at a Rogers & Hollands jewelry store, where she had been employed for the previous five years.

23. By all accounts, the close-knit Jaimes family enjoyed a happy and peaceful home life.

24. Unfortunately, their lives would be altered forever on November 15, 2015, when, in the middle of the night, Erika Aguirre, a corrections officer at the Cook County Jail who had recently dated Deisy, broke into their home and opened fire on the Jaimes family as they slept.

25. Officer Aguirre gained access to the Jaimes home by breaking in through a basement window.

26. Once Officer Aguirre entered the basement of the home, she was confronted by Cassandra Jaimes, Deisy's 17-year-old sister, who had heard the window break and decided to investigate.

27. Once confronted by Cassandra, Officer Aguirre immediately opened fire on her with her semi-automatic service weapon but missed and Cassandra managed to safely flee the home.

28. Officer Aguirre then proceeded through the basement and up the stairs to Deisy's bedroom, opening fire on her in the bedroom, and striking her six times, including in the head, shoulders, and legs.

29. On her way to Deisy's bedroom, Officer Aguirre twice shot Deisy's father Enrique, who had been awakened by the shots fired at Cassandra, striking him in the back.

30.     Fortunately, Gloria and the rest of the Jaimes family were able to escape through the front door of their home without being shot.

31.     When officers from the Bridgeview Police Department ("Bridgeview PD") arrived on the scene, they found Enrique in the basement awake but unable to respond to any questions except for nodding his head. Officers found Deisy in her bedroom unresponsive and suffering from a serious head wound.

32.     Both Enrique and Deisy Jaimes were transported by ambulance to Advocate Christ Medical Center in Oak Lawn where they remained in critical condition for a number of days.

33.     Officer Aguirre's body was found dead on the kitchen floor of the Jaimes home, the result of self-inflicted gunshot wound to the head.

34.     Officers from the Bridgeview PD were initially called to the home for a potential home invasion after neighbors reported seeing Officer Aguirre dressed in black walking next to the Jaimes home with a gun.

35.     On route to the home, responding officers from the Bridgeview PD were advised that neighbors had heard multiple gunshots fired from within the home.

36.     Bridgeview PD determined that Officer Aguirre fired approximately fifteen rounds inside the Jaimes home. Officer Aguirre's semi-automatic service weapon was recovered from the scene along with three magazines, each of which holds up to 15 rounds of ammunition.

37.     As a result of the attack on them by Officer Aguirre, both Enrique and Deisy Jaimes suffered severe and permanent physical injuries.

38.     Deisy Jaimes, who was shot in the left eye, suffers permanent brain damage, permanent damage to her arm and leg, as well as permanent disfigurement to her head and face.

39.     Enrique Jaimes, who was shot twice in the back, suffers permanent damage to his spinal cord, and is unable to walk without assistance.

40.     As a result of the attack on them by Officer Aguirre, Enrique, Gloria, and Deisy Jaimes suffer from extreme pain and suffering, including, but not limited to, severe emotional distress.

## B. Cook County Jail Corrections Officer Erika Aguirre

41.      Officer Erika Aguirre was hired by the Cook County Sheriff's Office as a Corrections Officer at the Cook County Jail ("CCJ") on December 27, 2010.

42.     On or about November 12, 2014, Defendants assigned Officer Aguirre to the Receiving, Classification, and Diagnostic Center ("RCDC") in Division 5 of the Cook County Jail.

43.     On January 5, 2011, Defendants signed a Certifying Statement swearing that Officer Aguirre could purchase a firearm for use in performing her official duties as a Cook County Corrections Officer. This was necessary for her to obtain a weapon.

44.     On or around January 15, 2011, Officer Aguirre purchased a 9mm Glock 19 (Serial Number PYX780) and registered it with the Defendants for the performance of her official duties as a Cook County Jail Corrections Officer.

45.     Officer Aguirre did not need to carry and/or use her service weapon to perform her duties within the Cook County Jail and never did do use it. Indeed, Officer Aguirre, like all other corrections officers employed at CCJ, was specifically **prohibited** from having her service weapon on her person at any time during the period of time that she was working at the CCJ.

46.     Rather, the Defendants permit CCJ officers like Officer Aguirre to carry their Cook County Sheriff's Office service weapon and ammunition only while off duty outside of the Cook County Jail.

47.     Officer Aguirre did not require a service weapon to carry out her duties (or for any official purpose) as a Cook County Jail Corrections Officer while on duty.

48.     Officer Aguirre did not require a service weapon as part of her status as a corrections officer while not working at the CCJ itself.

49.     At all relevant times, the Defendants had the authority and power to rescind or otherwise restrict the carrying of service weapons by CCJ corrections officers or jail guards, including by Officer Aguirre, while off duty, but never did.

**C. Officer Aguirre's Disciplinary History at Cook County Jail**

50.     On information and belief, Officer Aguirre had at least two major disciplinary actions taken against her while employed as a corrections officer with Cook County Jail.

51.     This includes a September 29, 2014 incident where Officer Aguirre was charged with "insubordination" and suspended for 2-days after she became "irate" and began yelling at supervisors. This incident occurred in the presence of a number of "inmates and other officers."

52.     Officer Aguirre's disciplinary history also includes a citation for unprofessional conduct for a September 13, 2015 incident in which she had a "verbal altercation" with another female officer in the Medical Area of the RCDC. According to witnesses, Officer Aguirre deliberately left her post (located at the opposite end of the RCDC) to enter the Medical Area in order to confront a fellow female officer. Once inside the Medical Area, an area of the RCDC that Officer Aguirre had no work related reason to be in, Officer Aguirre proceeded to yell at her fellow officer, aggressively pointing her finger mere inches from that officer's face, and telling her "not to be a trick", calling her a "snitch", and threatening to "knock her ass out" all in in the presence of other officers and detainees/inmates.

53.     While Officer Aguirre was accused of creating a hostile work environment as a result of this incident, and an investigation into this matter found that she was responsible for aggressively and unnecessarily escalating the situation, she was not disciplined for this matter.

54.     On information and belief, from 2010 through 2015, Officer Aguirre was involved in numerous additional altercations and/or confrontations with fellow employees and with detainees/inmates at the Cook County Jail.

55.     On information and belief, despite these potentially dangerous outbursts by Officer Aguirre, no official or supervisory officer from the CCSO or from the CCJ, including Defendants, followed up with Officer Aguirre to determine whether or not she was fit for duty as a CCJ correctional officer, let alone fit to be authorized to carry a service weapon.

**D. Officer Aguirre's Violent Relationship with Deisy Jaimes**

56.     Deisy Jaimes was involved in a romantic relationship and lived with Officer Aguirre for approximately four years prior to the shooting on November 15, 2015.

57.     Ms. Jaimes and Officer Aguirre had a tumultuous relationship. Officer Aguirre was a jealous and possessive partner, and she both mentally and physically abused Ms. Jaimes throughout the time that they were together.

58.     On information and belief, the Cook County Sheriff's Office was aware of the domestic abuse of Ms. Jaimes by Officer Aguirre.

59.     On information and belief, despite this knowledge, no official or supervisory officer from the CCSO or from the CCJ, including Defendants, followed up or checked in with Officer Aguirre to determine whether or not she was fit for duty as a CCJ correctional officer, let alone fit to be authorized to carry a service weapon.

60.     On information and belief, despite this knowledge, the Cook County Sheriff's Office allowed Officer Aguirre to remain employed as a corrections officer and continued to authorize her to carry a service weapon.

61.     Ms. Jaimes ended her relationship with Officer Aguirre a few months prior to the November 2015 shooting. The break up angered Officer Aguirre, causing her significant psychological and emotional distress.

62.     On information and belief, the Cook County Sheriff's Office was aware that Officer Aguirre was experiencing severe psychological and emotional distress as a result of her break up with Ms. Jaimes.

63.     On information and belief, despite this knowledge, as well as the knowledge that Officer Aguirre was a domestic abuser, no official or supervisory officer from the CCSO or the CCJ, including Defendants, followed up or checked in with Officer Aguirre to determine whether or not she was fit for duty as a CCJ correctional officer, let alone fit to be authorized to carry a service weapon.

64.     On information and belief, despite this knowledge, as well as the knowledge that Officer Aguirre was a domestic abuser, the Cook County Sheriff's Office allowed Officer Aguirre to remain employed as a corrections officer and continued to authorize her to carry a service weapon.

65.     On information and belief, prior to the November 15, 2015 shooting of Enrique and Deisy Jaimes, Officer Aguirre demonstrated a troubling pattern of behavioral violence that went uninvestigated and unpunished by the CCSO or by supervisory officials at the CCJ, including by Defendants.

66.     On information and belief, prior to the November 15, 2015 shooting of Enrique and Deisy Jaimes, Officer Aguirre was not fit for duty as a Cook County Jail corrections officer, nor was she fit to be authorized to carry a service weapon.

**E. Cook County Sheriff's Office Policy Regarding Service Weapons**

67.    The Cook County Sheriff's Office ("CCSO") is the principal law enforcement agency that serves Cook County, Illinois. The Cook County Sheriff's Office divides its operations into several departments, the most recognizable of which are the Cook County Sheriff's Police Department, the Court Services Division, and the Cook County Sheriff's Department of Corrections.

68.    Officers/deputies assigned to the Sheriff's Police Department provide basic law enforcement duties primarily in the unincorporated areas of Cook County. Officers/deputies assigned to the Court Services Division primarily serve as court bailiffs. Officers/deputies assigned to the Department of Corrections ("Cook County Jail" or "CCJ") serve as corrections officers and/or jail guards within the county jails.

69.    Despite vast differences in duties, the Sheriff requires all three types of officers/deputies to be sworn and certified peace officers, intending that they become authorized to carry a service weapon.

70.    Cook County, through the Cook County Sheriff's Office, is the only county in Illinois to deputize county correctional officers/jail guards, authorizing these officers/guards to carry service weapons. Put another way, no county jail in Illinois located outside of Cook County authorizes its corrections officers or jail guards to carry a service weapon.

71.    Cook County Sheriff's officers assigned to work inside the Cook County Jail, including the Receiving, Classification, and Diagnostic Center ("RCDC"), are

prohibited from bringing their service weapons into the Jail. Instead, officers assigned to the Jail must present their service weapon to a security guard at the Cook County Jail Armory (located in Division 5) to be locked and secured before the officer may enter the Jail to start their shift.

72.    CCJ officers/guards are not required to carry their service weapon when off duty, and nothing about the duties of a correctional officer or jail guard at CCJ make it necessary for officers to carry a service weapon while off duty. Indeed, unless "someone's life is in danger," CCJ officers/guards are trained not to get involved in criminal situations nor to attempt to stop crimes in progress, but instead, just like any member of the general public, to call 911.

73.    In short, CCJ corrections officers or jail guards are prohibited from carrying their service weapon while on duty and have no official use for a service weapon while off duty. Nevertheless, for no sufficient purpose, the Sheriff takes on risk of misuse (all without ample safeguards) by authorizing them to carry weapons off duty and requiring them to own a service weapon because they must take part in annual recertification training.

## F.  Background: Cook County Jail

74.    Located on approximately 96 acres in Chicago, Illinois, the Cook County Jail is the largest single-site county jail in the United States. The Cook County Jail is divided into 11 divisions and is staffed by approximately 3,800 officers/guards and civilian employees.

75.     All corrections and security functions at the Cook County Jail are administered by the Cook County Department of Corrections through the Cook County Sheriff's Office.

76.     Since 2008, Division V of the Cook County Jail has been a Transitional Housing Unit that includes the main administration offices, as well as the records department, the Armory, and the Receiving, Classification, and Diagnostic Center ("RCDC").

77.     Located in the lower level of Division V, the RCDC handles reception, classification, and the discharge of Cook County Jail detainees and inmates.

78.     Officers/guards assigned to the RCDC are responsible for, among other things, processing detainees into and out of the Cook County Jail, photographing and fingerprinting detainees, taking personal property inventories, and providing detainees with Jail-issued clothing.

79.     As indicated above, from about November 12, 2014 Officer Aguirre was assigned to the RCDC of Cook County Jail.

**G. Rampant Excessive Force at Cook County Jail**

80.     Detainees at Cook County Jail are regularly subjected to excessive force by CCJ corrections officers and/or jail guards.

81.     For example, a 2007 investigation by the Department of Justice Civil Rights Division, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), found that: "inmates at Cook County Jail are regularly subjected to inappropriate and excessive uses of physical force," and that "Cook County Jail

officers too often respond to inmates' verbal insults or failure to follow instructions by physically striking [them], most often with the assistance of other officers, even when the inmate presents no threat to anyone's safety or [to] the security of the facility." Department of Justice CRIPA Report on Cook County Jail ("DOJ CRIPA Report"), July 11, 2008, at pg. 10.

82.     As one "top security administrator frankly acknowledged" to DOJ investigators, there is a deep seated "culture of abusing inmates" at Cook County Jail "in which the excessive and inappropriate use of physical force [against detainees and/or inmates] is too often tolerated" by administrative and supervisory officials. DOJ CRIPA Report, at pg. 10.

83.     While this "pattern of inappropriate and excessive use of force" is distributed throughout all of Cook County Jail's 11 Divisions," DOJ investigators found "an especially high number of [excessive] force allegations…at the RCDC," including multiple examples of "corrections officers in organized groups beating inmates." DOJ CRIPA Report, at pg. 16 (finding that "[t]he RCDC is chronically overcrowded, cramped, chaotic, and insufficiently staffed…[and] prisoners who request attention for various needs risk being assaulted by [RCDC] guards"; also finding that RCDC detainees, especially older detainees as well as those who do not speak English, are regularly beaten for not following orders fast enough, citing the example of a detainee suffering multiple fractures and a collapsed lung for not immediately returning an officer's borrowed pen).

84. Indeed, the DOJ CRIPA Report provides a long list of examples of excessive force by Cook County Jail officers/guards against detainees, including at the RCDC, many of which resulted in serious injuries requiring hospitalization. *See e.g.*, DOJ CRIPA Report, at pgs. 11-18.

85. The following is just a small sample of the examples of officer violence cited in the DOJ CRIPA Report:

    a. Detainee attacked by a number of officers after verbal altercation related to a dinner tray where emergency records show detainee suffered blunt trauma to his head and body, three teeth knocked loose, and a laceration to his lower lip (pg. 11);

    b. Detainee punched and kicked by multiple RCDC officers while restrained because he was in possession of an unauthorized shirt resulting in a broken jaw that required surgery at an outside hospital (pg. 13);

    c. Detainee handcuffed behind his back, and has his head pushed into concrete wall, before being thrown down a flight of stairs, and punched and kicked repeatedly in the face by multiple officers as a result of insisting he be able to speak with a supervisor (pg. 13);

    d. Detainee beaten by RCDC officers who called him a "f------ Mexican" and threatened to kill him if he reported the incident. Detainee suffered broken ribs and damage to his jaw and knee as a result of the attack (pg. 17); and

e.   Detainee severely beaten by RCDC officers because he asked for his methadone medication, resulting in multiple fractures and a collapsed lung. Detainee's injuries were so severe he needed to be transferred to a Level 1 trauma center and placed on a ventilator (pg. 17).

86.   This pattern of the regular use of excessive force against detainees by CCJ officers/guards is not confined to the period of time evaluated by the DOJ but rather continues until the present day.

87.   For example, a 2016 Better Government Association ("BGA") study of officer-on-detainee violence at Cook County Jail found that from 2008 through 2015, the most recent period for which figures were readily available, there were at least 1094 complaints of excessive force filed by detainees against CCJ corrections officers or guards. During this same time period, there have also been dozens of lawsuits filed by detainees and former detainees alleging excessive force by CCJ correctional officers.

88.   Similarly, in a 2014 sworn declaration supporting class certification in *Hudson v. Preckwinkle*, *et. al.*, a case dealing specifically with the widespread brutality of CCJ officers against detainees and/or inmates, renowned jail and prison expert Dr. Jeffrey Schwartz indicated that excessive force by CCJ officers and/or guards was by far the most common complaint lodged by detainees.

89.   Indeed, Dr. Schwartz, who has thirty years of experience in the field of prison administration/operations/conditions, including as a court appointed monitor, and who has evaluated some of the largest jails and prison systems in the

country, described Cook County Jail as "an environment in which brutality is widespread" and is often perpetrated by "groups of officers" who "viciously" beat detainees/inmates and then threaten or intimidate them into not reporting their misconduct.

90.     The following is just a small sample of the examples of officer violence cited in the sworn declarations and grievances by CCJ detainees reviewed by Dr. Schwartz:

   a.  "I have seen officers randomly beat up other inmates and then lied about starting the situation…When the officers engage in any violent conduct towards inmates, they either turn the cameras off for a period of time or they only turn them on after they beat up the inmates" (pg. 19);

   b.  "[The detainee] wasn't causing any trouble but [three] officers beat him and stomped him into the ground. I saw them stomping him and kicking him while the detainee was passed out" (pg. 15);

   c.  "On May 29, 2013…I was attacked by Officer Harrerro, Sergeant Jones,…and other personnel…Officer Harrerro claimed that I attacked him. They threw me on the ground and kicked my face. I was sent to the hospital. They falsely accused me and charged me with battery. They did this away from the cameras" (pg. 11).

91.     Administrators and supervisory officials at both the CCSO and the CCJ are well aware of the longstanding and regular abuse of detainees/inmates at

Cook County Jail by CCJ corrections officers or guards. *See e.g.*, Declaration of Dr. Jeffrey Schwartz, *Hudson v. Preckwinkle*, *et. al.*, 13-cv-8752, Dkt. 15-20, at 8 (finding that "high-ranking officials in the management and administration of CCSO had to have known about" the large scale problem with excessive force at CCJ:" 1) because the "CRIPA investigation by the U.S. Department of Justice that resulted in a consent decree," as well as the periodic reports by the Court Monitor since that consent decree, have focused on staff use of force; and 2) because of the "seriousness of the incidents…and the frequency with which excessive force" occurs at the Cook County Jail).

## H. The CCSO and CCJ Have a Long History of Covering Up and Condoning Corrections Officer and/or Jail Guard Misconduct

92.     Supervisory officials at the CCSO and the CCJ (as well as the corrections officers and jail guards themselves), including Defendants, have a long history of covering up and/or condoning excessive force by CCJ correctional officers and/or jail guards.

93.     As Dr. Schwartz indicated in his sworn declaration, the "systemic abuse of detainees/inmates" at Cook County Jail by CCJ officers is "***maintained by a long-standing and pervasive code of silence that few officers are willing to break***." Declaration of Dr. Jeffrey Schwartz, *Hudson v. Preckwinkle*, *et. al.*, 13-cv-8752, Dkt. 15-20, at 7 (emphasis added).

94.     Examples of this code of silence at the Cook County Jail include:

a. January 2012 incident in which Sergeant James Elwood witnessed Correctional Officer Luis Zuniga repeatedly kick a detainee in the face

while he was handcuffed on the ground. Not only did Sergeant Elwood deliberately fail to activate his body camera to record the incident, when the camera was properly activated he repeatedly placed his finger over the lens so that it would not capture Zuniga's use of excessive force. In addition to this, Sergeant Elwood failed to submit an incident report documenting Zuniga's excessive force, and did not report this incident to his supervisors. Finally, Sergeant Zuniga signed a witness statement to internal affairs that falsely stated that he did not witness the attack. At the time of this incident, Sergeant Elwood had another pending complaint against him for the excessive use of force and for the failure to report the excessive use of force (*see* Cook County Sheriff's Merit Board Decision, Docket #1810, February 22, 2016);

b. January 2014 incident in which a detainee who refused to enter a quarantined cell was beaten by a corrections officer while other officers looked on. The attack on the detainee resulted in facial injuries. Several officers, a sergeant, and at least one internal affairs investigator were alleged to have filed false reports that made no mention of the attack on the detainee (see *Bolton c. Dart*, *et. al.*, 16-cv-5012);

c. April 2006 incident in which an inmate who refused to go to the recreation room because he needed to use the bathroom was beaten

and kicked by several officers. This incident was witnessed by a
Sergeant who eventually joined in the beating. The attack on the
inmate resulted in severe neck injuries. All seven officers and the
Sergeant involved in the attack filed false use of force reports (*see* DOJ
CRIPA Report, at pg. 13);

d. The refusal to provide detainees/inmates with grievance forms to
report the excessive use of force (*see e.g.*, Declaration of Dr. Jeffrey
Schwartz, *Hudson v. Preckwinkle, et. al.*, 13-cv-8752, Dkt. 15-20, at 13
("I wanted to file a grievance for their excessive use of force and for
denying me medical attention, but they wouldn't give me any. The
officers protect themselves and their buddies") (citing to one of the
eighty-four sworn inmate declarations Dr. Schwartz reviewed in the
preparation of his own sworn statement));

e. The failure to respond to detainee/inmate grievances regarding the
excessive use of force, or to otherwise investigate these complaints (*see
e.g.*, Declaration of Dr. Jeffrey Schwartz, *Hudson v. Preckwinkle, et. al.*,
13-cv-8752, Dkt. 15-20, at 9 ("On July 6, 2013 I was beaten by staff. I
filed a grievance and a report with the OPR. No one ever met with me
or talked to me about these grievances or complaints") (citing to one of
the eighty-four sworn inmate declarations Dr. Schwartz reviewed in
the preparation of his own sworn statement)); and

f. A pattern of harassment, verbal threats, and physical abuse against corrections officers/jail guards who refuse to cover-up the use of excessive force at CCJ (*see e.g.*, allegations and testimony of former CCJ corrections officers Roger Fairly and Richard Gackowski in *Fairley v. Andrews*, *et. al.*, 07-cv-3343 and *Fields v. Velasco*, *et. al.*, L009339 (alleged that they were forced to resign because they refused to cover up the severe beating of 5 shackled inmates by approximately 20 CCJ correctional officers as well as other incidents of excessive force; alleged harassment included death threats, denied paternity leave by the Cook County Sheriff's Office, and getting stabbed by an inmate at the behest of a fellow officer who was named in a use of force report)).

95. The above examples are supported by the 2008 DOJ CRIPA report regarding abusive conditions at CCJ. DOJ investigators found the following in relation to the code of silence at the Jail:

a. Attempts by corrections officers and other staff to conceal the inappropriate and excessive use of force (DOJ CRIPA Report, at pg. 22);

b. Attempts by senior division staff to dissuade inmates from complaining about the use of forcing, including through the use of threats (pg. 22);

     c.   That CCJ fails to initiate many use of force investigations and any such investigations are "reactive and suffer from the appearance of bias" (pg. 21);

     d.   That Commanders admit that they do not review use of force reports (pg. 18);

     e.   That CCJ fails to elicit adequate information about use of force incidents making proper management review impossible and/or ineffective (pg. 18);

     f.   The use of investigative techniques that are "unlikely to result in complete or credible information (pg. 22); and

     g.   In most cases, internal affairs investigations of the use of force are only undertaken when a lawsuit is filed, rather than when a serious incident occurs (pg. 18).

96.    In this way, Cook County Jail is deliberately set up in a manner that affirmatively discourages the investigation of corrections officers who engage in misconduct, or else, makes it more difficult to identify potential misconduct in the first place. As such, in the BGA study cited above that found at least 1094 complaints of excessive force by CCJ detainees/inmates against corrections officers/jail guards from 2008 through 2014, it was determined that in only 46 of these cases, a mere 4.2% of all complaints, did any officer involved face any form of discipline for their misconduct. *See e.g.*, https://chicago.suntimes.com/news/cook-county-jail-guard-beats-prisoner-on-ground-but-keeps-job.

97.     On information and belief, CCJ corrections officers/jail guards are first taught this code of silence at the CCSO training academy. *See e.g.*, allegations and testimony of former CCJ corrections officers Roger Fairly and Richard Gackowski in *Fairley v. Andrews*, *et. al.*, 07-cv-3343 and *Fields v. Velasco*, *et. al.*, L009339 (alleging that in separate training classes at the CCSO training academy they were taught to remain silent when asked about misconduct at CCJ by "CCJ outsiders" including members of the press and the legal community).

98.     This code of silence, including the failure to discipline, suspend, or terminate corrections officers engaged in excessive force, emboldens officers to commit even more violence and/or to act with impunity because they believe that their actions are condoned by their supervisors and/or that there will be few if any consequences for continuing to brutalize detainees and/or inmates.

## I.   CCSO and CCJ's Failure to Maintain a Proper Early Warning System

99.     An appropriate early warning system is an accountability tool that allows for early intervention by alerting a facility to a need for retraining, problematic policies, supervision lapses, or possible bad/violent actors. *See* DOJ CRIPA Report, at pg. 20.

100.    An appropriate early warning system helps ensure safer conditions for detainees/inmates (and more generally for the public as well) by allowing prisons or jails to identify and retrain and/or remove and/or terminate consistently violent employees. *See e.g.*, DOJ CRIPA Report, at pg. 20.

101.    The early intervention program for correctional officers/jail guards employed by the Cook County Jail is found in CCSO General Order 24.9.16.0 Use of Force Alert and Early Intervention ("CCJ Early Intervention Program").

102.    The CCJ Early Intervention Program was adopted in December 2011.

103.    The purpose of the CCJ Early Intervention Program is to establish "a review system that identifies employees involved in a higher than usual number of use of force incidents and, when appropriate, provides assistance or intervention to such employees." CCSO General Order 24.9.16.0 Use of Force Alert and Early Intervention, at pg. 1.

104.    According to CCSO General Order 24.9.16.0, the Cook County Jail is required to "track and promptly review documentation surrounding uses of force within the [Jail]" in order to "develop strategies to address any circumstances that may cause a sworn employee to be involved in an unusually high number of use of force incidents." *Id*. The Cook County Jail was further required to provide remedial training or some form of intervention or assistance for such employees. *Id*.

105.    In short, the CCJ Early Intervention Program is supposed to work as follows:

a.  The Office of Professional Review ("OPR") sets a threshold to identify employees involved in a higher than usual number of use of force incidents;

b.  Once this threshold is met, OPR sends an alert to the Executive Director of the CCJ;

c. The Executive Director appoints a supervisor (preferably the employee's immediate supervisor) to prepare a Use of Force Early Intervention Review Report (Early Intervention Report);

d. The Early Intervention Report must include, among other information, a summary of the employee's most recent uses of force, recent disciplinary actions, inmate grievances, interviews with prior and present supervisors, as well any other information which might be helpful in the overall evaluation of the employee at issue;

e. The Early Intervention Report is forwarded to the Use of Force Data Collection and Review Unit which reviews all such reports in order to develop solutions to potential deficiencies in the application, training, and reporting of the use of force;

f. The supervisor who prepared the Early Intervention Report then meets with the department head to review the Report and determine if some type of intervention is advisable;

g. Possible interventions include: remedial training; reassignment; referral to counseling or therapy programs; or a request for a Fitness for Duty Examination. See CCSO General Order 24.9.16.0 Use of Force Alert and Early Intervention, at pgs. 1-4.

106. On information and belief, despite the existence of a written early intervention policy, no or little attempt was/is made to identify Cook County Jail corrections officers or guards frequently involved in the excessive use of force. *See*

*e.g.*, *Bolton v. Dart*, *et. al.*, 16-cv-5012 (Defendant accused of (and eventually terminated for) beating plaintiff without cause on video had 14 other use of force complaints in his personnel file but was never placed in the CCJ Early Intervention Program) (Defendant Sergeant testified at his deposition that he had been placed in the CCJ Early Intervention Program for the first time after having more than 100 use of force complaints in his personnel file and that the early intervention process consisted of a very short meeting with his supervisor who asked him if he was O.K.).

107.    On information and belief, the CCJ Early Intervention Program is wholly ineffective in identifying Cook County Jail corrections officers or guards frequently involved in the excessive use of force and/or prone to violence. *See e.g.*, *Bolton v. Dart*, *et. al.*, 16-cv-5012 (Defendant accused of (and eventually terminated for) beating plaintiff without cause on video had 14 other use of force complaints in his personnel file but was never placed in the CCJ Early Intervention Program) (Defendant Sergeant testified at his deposition that he had been placed in the CCJ Early Intervention Program for the first time after having more than 100 use of force complaints in his personnel file and that the early intervention process consisted of a very short meeting with his supervisor who asked him if he was O.K.).

108.    On information and belief, the CCSO and other supervisory and policy-making officials at the Cook County Jail, including Defendants, were well aware that the CCJ Early Intervention Program was wholly ineffective in identifying and/or dealing with CCJ corrections officers/guards who were/are more likely to engage in excessive force and/or prone to violence.

109.    On information and belief, the failure of the CCSO and the CCJ to identify and/or weed out its most violence-prone and/or violent employees posed/poses a real and unnecessary risk of serious harm to the public.

110.    This risk of harm to the public is made even more serious by CCSO's policy of authorizing, and in practice, requiring that Cook County Jail corrections officers/guards possess a service weapon despite the fact that these officers/guards are prohibited from carrying their service weapon while at the Jail and have no official use for their service weapon while off-duty.

111.    In short, the CCSO has a policy of arming CCJ corrections officers/guards, including employees that the CCSO is fully aware engage in widespread violence at the Jail, despite there being absolutely no need for these officers/guards to be so armed. Indeed, as indicated above, Cook County is the only county in Illinois that authorizes jail corrections officers or guards to carry a service weapon.

**J.  CCSO and CCJ's Failure to Prevent Foreseeable Harm to the Public**

112.    The CCSO was either aware, or should have been aware, that the above described conditions – namely the unnecessary arming of corrections officers, including officers who engage in regular excessive force/violence at the Jail; widespread staff-on-detainee/inmate violence at CCJ (particularly at RCDC); the failure to train, identify, or discipline officers who engage in excessive force; the creation and maintenance of a code of silence that ignores and/or condones officer violence; and the failure to identify and weed out the worst/most violent actors – led

to and/or emboldened violent CCJ officers/guards to also inflict violence on the general public.

113.    For example, it is a well-known fact that law enforcement personnel generally, including correctional officers, engage in domestic violence at a rate that far exceeds that of the general population. *See e.g.*, Sandra Pugliese, Police Murder-Suicides Raise Awareness of Domestic Violence, Guardian Liberty Voice (April 20, 2014) (citing to National Centre for Women and Policing studies that indicate that at least 40% of "police" families experience domestic violence, a rate 30% higher than the general population); *see also e.g.*, L.B. Johnson, *On the front lines: Police stress and family well-being*. Hearing before the Select Committee on Children, Youth, and Families, House of Representatives: 102 Congress, First Session, 1991.

114.    However, the CCSO's knowledge and/or awareness that the conditions described above led to and/or emboldened violent CCJ officers/guards to also inflict violence on the general public was far from just theoretical. In fact, prior to the November 2015 shooting of Deisy and Enrique Jaimes by Officer Aguirre, there were multiple incidents where a Cook County Jail corrections officer/guard with a history of misconduct at CCJ and/or in public, committed serious acts of violence using their service weapon. This includes, just as in the case of Officer Aguirre, CCJ corrections officers/guards using their service weapon to kill and/or gravely injure their estranged partners before turning their weapon on themselves. For example:

    a.  On October 14, 2010 CCJ Corrections Officer Alexander Rojo shot and killed his estranged wife Nancy Mendoza Rojo with his service weapon

while she was out walking her dog. Officer Rojo shot his estranged wife eight times before turning the gun on himself. The shooting occurred less than a month after Ms. Mendoza Rojo had accused her estranged husband of violently attacking her in their Plainfield home, causing her to file for an order of protection against him. During that incident, as Ms. Mendoza Rojo arrived home from work, Officer Rojo without provocation slammed her against the basement door, pulled out his service weapon, cocked it, placed the weapon against her face, and then told her he was going to kill her. Ms. Mendoza Rojo lay on the basement floor in the fetal position for multiple hours before Officer Rojo called the Chicago Police Department ("CPD") and claimed that Ms. Mendoza Rojo had tried to kill herself;

b. On April 20, 2014 CCJ Corrections Officer Javier Acevedo shot and killed his wife Veronica Acevedo with his service weapon while she slept in the bedroom of the home they shared before turning the gun on himself. Officer Acevedo, a 25-year veteran of the Jail, had previously been involved in a road rage incident involving the use of his service weapon;

c. On August 8, 2013 CCJ Corrections Officer Edgar Singleton shot and killed 23-year-old Montrell Moss with his service weapon in a road rage incident because Moss had thrown a small paper cup of water at Officer Singleton's van after Officer Singleton had cut him off multiple

times. Previous to this deadly incident, Officer Singleton had at least
one additional violent outburst involving his service weapon when he
pulled his gun on five teenagers on the CTA allegedly for calling him a
"sissy" or words to that effect;

d. On September 3, 2014 CCJ Corrections Officer Walter Fernandez
pulled out his service weapon in front of his terrified one-time
girlfriend, asked her if she thought he "was playing" or whether "this
was a joke", and then shot himself in the abdomen. Prior to shooting
himself, Officer Fernandez had a long history of psychological issues,
as well as allegations against him for stalking and domestic abuse;

e. On May 26-27, 2014 CCJ Corrections Officer Kirk Ortiz, after
consuming alcohol while carrying his service weapon in the waistband
of his pants, as well as discharging his service weapon without cause in
the backyard of a friend's home, either shot and killed a young women
staying at the home or else did not adequately secure his service
weapon so that at some point after he fell asleep in his car (after
consuming alcohol) the young woman was able to gain possession of
Officer Ortiz's service weapon and shoot herself. Despite CPD making
the CCSO aware of this incident immediately, Officer Ortiz was not
placed on administrative leave until nearly two years later;

115.    On information and belief, prior to the incidents described above, each of the officers mentioned in paragraph 111 had multiple use of force complaints filed against them while employed at the Cook County Jail.

116.    On information and belief, prior to the incidents described above, each of the officers mentioned in paragraph 111 had multiple additional verbal and/or physical altercations with detainees/inmates at Cook County Jail.

117.    On information and belief, prior to the incidents described above, and during the time that they were employed as corrections officers at CCJ, Officers Rojo, Acevedo, and Fernandez had one or more complaints of domestic violence against them.

118.    On information and belief, prior to the incidents described above, the CCSO and/or supervisory officials at CCJ, were aware of these domestic violence complaints but took no steps to investigate them and/or to determine whether or not these officers were fit for duty as CCJ correctional officers, let alone fit to be authorized to carry a service weapon.

## K. The CCSO and CCJ Have an Incentive Not to Investigate Complaints of Domestic Abuse and/or Domestic Violence

119.    Passed into law in the fall of 1996, Title 18, U.S.C. §922(g)(9), the Lautenberg Amendment, or the "Gun Ban for Individuals of a Misdemeanor Crime of Domestic Violence," extended the 1968 Gun Control Act and its subsequent amendments to ban anyone convicted of a misdemeanor crime of domestic violence from possessing a firearm.

120.    As was indicated at the time of passage, the bill represented "Congress' recognition that anyone who attempts or threatens violence against a loved one has demonstrated that he or she poses and unacceptable risk, and should be prohibited from possessing firearms." *See* Congressional Record, pg. S11878 (accessed at http://www.justice.gov/usam/criminal-resource-manual-1117-restrictions-possession-firearms-individuals-convicted).

121.    The bill had three stated purposes: 1) it would assist in preventing those individuals who have demonstrated a propensity for domestic violence from obtaining a firearm; 2) it would assist law enforcement by providing a tool for the removal of firearms from certain explosive domestic situations thus decreasing the possibility of deadly violence; and 3) it would serve as a federal prosecution tool in certain situations where alternatives have failed. *Id*.

122.    Importantly, the bill had no law enforcement exception, and it removed the exception that the Gun Control Act had provided to police and the military. *Id*. As such, as of the effective date of passage in 1996, "any member of the military or any police officer who has a qualifying misdemeanor conviction is no longer able to possess a firearm, even while on duty. *Id*.

123.    On information and belief, pursuant to CCSO policies and procedures, if a CCSO officer/deputy is convicted of a misdemeanor domestic battery, that officer/deputy is prohibited from carrying a service weapon, which would trigger a termination proceeding. *See e.g*., CCSO General Order 11.2.20.0 (Rules of Conduct). As such, the CCSO has an incentive to conduct inadequate investigations into

domestic violence allegations, or not to investigate any such complaints at all, in order to avoid the termination of any of its officers.

124.    On information and belief, prior to the incidents described in paragraph 111 above, and during the time that they were employed as corrections officers at CCJ, the CCSO and/or supervisory officials at CCJ were aware that Officers Rojo, Acevedo, and Fernandez had one or more complaints of domestic violence against them but took no steps to investigate these complaints and/or to determine whether or not these officers were fit for duty as CCJ correctional officers, let alone fit to be authorized to carry a service weapon.

125.    On information and belief, prior to the November 15, 2015 shooting of Deisy and Enrique Jaimes, the CCSO and/or supervisory officials at CCJ were aware that Officer Aguirre had one or more complaints of domestic violence against her but took no steps to investigate these complaints and/or to determine whether or not Officer Aguirre was fit for duty as CCJ correctional officer, let alone fit to be authorized to carry a service weapon.

## Legal Claims

### Count I – 42 U.S.C. § 1983
### Failure to Intervene

126.    Each of the Paragraphs of this Complaint is incorporated herein.

127.    As described in detail above, one of more Defendants had a reasonable opportunity to prevent the violation of Plaintiffs' constitutional rights had they been so inclined, but failed to do so.

128.   Defendants' actions were undertaken intentionally, with malice, and with reckless indifference to Plaintiffs' rights.

129.   As a direct and proximate result of the misconduct described in detail above, Plaintiffs' rights were violated, and they suffered serious bodily injuries, as well as severe emotional distress.

130.   Plaintiffs' injuries were caused by employees of the Cook County Sheriff's Office and of Cook County, including Defendants, who acted pursuant to the policies and practices of the Cook County Sheriff's Office and of Cook County as described above.

### Count II - 42 U.S.C. § 1983
### *Monell* – Policy, Practice, and/or Custom
### Cook County Sheriff Failed to Investigate and/or Discipline Officer Misconduct

131.   Each of the Paragraphs of this Complaint is incorporated herein.

132.   The misconduct described in detail above was undertaken pursuant to the policy and practice of the Cook County Sheriff's Office in that:

    a.   as a matter of both policy and practice, the Cook County Sheriff's Office directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, and control its corrections officers, such that its failure to do so manifests deliberate indifference;

    b.   as a matter of both policy and practice, the Cook County Sheriff's Office facilitates the very type of misconduct at issue here by failing to adequately investigate, punish, and discipline prior instances of

similar misconduct, thereby leading Cook County Jail corrections officers to believe that their actions will never be scrutinized and/or to act with impunity and thereby directly encouraging future abuses;

c. generally, as a matter of widespread practice so prevalent as to comprise Jail policy, corrections officers of the Cook County Jail abuse detainees in a manner similar to that alleged by Plaintiffs on a frequent basis, yet the Sheriff's Office and/or Cook County Jail make findings of wrongdoing in a disproportionately small number of cases;

d. generally, as a matter of widespread practice so prevalent as to comprise Jail policy, corrections officers of the Cook County Jail commit acts of violence against the public in a manner similar to that alleged by Plaintiffs on a frequent basis, yet the Sheriff's Office and/or Cook County Jail fail to investigate complaints of same and/or make findings of wrongdoing in a disproportionately small number of cases;

e. County policy-makers, including Defendant Sheriff Dart, are aware of, condone, and facilitate by their inaction, a "code of silence" in the Cook County Jail. Corrections officers routinely fail to report instances of officer misconduct and lie to protect each other from punishment, thereby going without discipline for their unconstitutional actions; and

f. the Sheriff's Office has failed to act to remedy the patterns of abuse, despite actual knowledge of same, thereby causing the types of injuries alleged herein. Alternatively, Defendants were at least deliberately

indifferent to the same, and their acts were undertaken intentionally with malice, willfulness, and deliberate indifference to the rights of Plaintiffs.

133. As a direct and proximate result of County's policy and practice, Plaintiffs have suffered bodily injury, as well as severe emotional distress.

### Count III – 42 U.S.C. § 1983
### *Monell* – Policy, Practice, and/or Custom
### Cook County Sheriff Failed to Maintain a Proper Early Warning System

134. Each of the Paragraphs of this Complaint is incorporated herein.

135. The misconduct described in detail above was undertaken pursuant to the policy and practice of the Cook County Sheriff's Office in that:

   a. as a matter of both policy and practice, the Cook County Sheriff's Office directly encourages, and is thereby the moving force behind, the very type of misconduct at issue here by failing to adequately train, supervise, and control its corrections officers, such that its failure to do so manifests deliberate indifference;

   b. as a matter of both policy and practice, the Cook County Sheriff's Office facilitates the very type of misconduct at issue here by failing to adequately investigate, punish, and discipline prior instances of similar misconduct, thereby leading Cook County Jail corrections officers to believe that their actions will never be scrutinized and/or to act with impunity and thereby directly encouraging future abuses;

c. generally, as a matter of widespread practice so prevalent as to comprise Jail policy, corrections officers of the Cook County Jail abuse detainees in a manner similar to that alleged by Plaintiffs on a frequent basis, yet the Sheriff's Office and/or Cook County Jail make findings of wrongdoing in a disproportionately small number of cases;

d. generally, as a matter of widespread practice so prevalent as to comprise Jail policy, corrections officers of the Cook County Jail commit acts of violence against the public in a manner similar to that alleged by Plaintiffs on a frequent basis, yet the Sheriff's Office and/or Cook County Jail fail to investigate complaints of same and/or make findings of wrongdoing in a disproportionately small number of cases;

e. County policy-makers, including Defendant Sheriff Dart, are aware of, condone, and facilitate by their inaction, a "code of silence" in the Cook County Jail. Corrections officers routinely fail to report instances of officer misconduct and lie to protect each other from punishment, thereby going without discipline for their unconstitutional actions; and

f. the Sheriff's Office has failed to act to remedy the patterns of abuse, despite actual knowledge of same, thereby causing the types of injuries alleged herein. Alternatively, Defendants were at least deliberately indifferent to the same, and their acts were undertaken intentionally with malice, willfulness, and deliberate indifference to the rights of Plaintiffs.

136.    As a direct and proximate result of County's policy and practice,

Plaintiffs have suffered bodily injury, as well as severe emotional distress.

**Count IV – 42 U.S.C. § 1983**
***Monell* – Policy, Practice, and/or Custom**
**Cook County Sheriff Maintained a Code of Silence**

137.    Each of the Paragraphs of this Complaint is incorporated herein.

138.    The misconduct described in detail above was undertaken pursuant to

the policy and practice of the Cook County Sheriff's Office in that:

a.   as a matter of both policy and practice, the Cook County Sheriff's

Office directly encourages, and is thereby the moving force behind, the

very type of misconduct at issue here by failing to adequately train,

supervise, and control its corrections officers, such that its failure to do

so manifests deliberate indifference;

b.   as a matter of both policy and practice, the Cook County Sheriff's

Office facilitates the very type of misconduct at issue here by failing to

adequately investigate, punish, and discipline prior instances of

similar misconduct, thereby leading Cook County Jail corrections

officers to believe that their actions will never be scrutinized and/or to

act with impunity and thereby directly encouraging future abuses;

c.   generally, as a matter of widespread practice so prevalent as to

comprise Jail policy, corrections officers of the Cook County Jail abuse

detainees in a manner similar to that alleged by Plaintiffs on a

40

frequent basis, yet the Sheriff's Office and/or Cook County Jail make findings of wrongdoing in a disproportionately small number of cases;

d.  generally, as a matter of widespread practice so prevalent as to comprise Jail policy, corrections officers of the Cook County Jail commit acts of violence against the public in a manner similar to that alleged by Plaintiffs on a frequent basis, yet the Sheriff's Office and/or Cook County Jail fail to investigate complaints of same and/or make findings of wrongdoing in a disproportionately small number of cases;

e.  County policy-makers, including Defendant Sheriff Dart, are aware of, condone, and facilitate by their inaction, a "code of silence" in the Cook County Jail. Corrections officers routinely fail to report instances of officer misconduct and lie to protect each other from punishment, thereby going without discipline for their unconstitutional actions; and

f.  the Sheriff's Office has failed to act to remedy the patterns of abuse, despite actual knowledge of same, thereby causing the types of injuries alleged herein. Alternatively, Defendants were at least deliberately indifferent to the same, and their acts were undertaken intentionally with malice, willfulness, and deliberate indifference to the rights of Plaintiffs.

139.   As a direct and proximate result of County's policy and practice, Plaintiffs have suffered bodily injury, as well as severe emotional distress.

**Count V – State Law Claim**
**Cook County Sheriff's Breach of Duty in Hiring, Training, and**
**Supervising – Negligence**

140.     Each of the Paragraphs of this Complaint is incorporated herein.

141.     The County of Cook, the CCSO, and the CCJ had a duty to exercise

due care in hiring CCJ correctional officers, and had a duty to properly train,

supervise, and discipline CCJ corrections officers in relation to their duties,

including the use of excessive force.

142.     The County of Cook, the CCSO, and the CCJ breached those duties by

failing to exercise due care in hiring and then failing to properly train, supervise,

and discipline officers involved in the use of excessive force.

143.     As a direct and proximate cause of the County of Cook, the CCSO, and

CCJ failing to exercise due care in hiring and failing to train, supervise, and

discipline CCJ corrections officers, Officer Erika Aguirre was able to use her service

weapon to shoot and severely injure Deisy and Enrique Jaimes.

**Count VI – State Law Claim**
**Cook County Sheriff's Breach of Duty in Authorizing Service**
**Weapons for Corrections Officers – Willful and Wanton Conduct**

144.     Each of the Paragraphs of this Complaint is incorporated herein.

145.     The County of Cook, through the CCSO, had a duty to refrain from

willful and wanton conduct in the authorization of service weapons for County

employees who did not in any way require a service weapon for the performance of

their official duties.

146.   The County of Cook, through the CCSO, breached that duty by enacting a policy whereby all Cook County Jail corrections officers and/or jail guards were authorized and/or required to carry a service weapon despite not requiring a service weapon for the performance of their official duties.

147.   As a direct and proximate cause of the County of Cook's, through the CCSO, willful and wanton conduct in authorizing/requiring all CCJ corrections officers to carry a service weapon, Officer Erika Aguirre used her service weapon to shoot and severely injure Deisy and Enrique Jaimes.

## Count VII – State Law Claim
## Cook County Sheriff's Breach of Duty in Hiring – Willful and Wanton Conduct

148.   Each of the Paragraphs of this Complaint is incorporated herein.

149.   The County of Cook, the CCSO, and the CCJ had a duty to refrain from willful and wanton conduct in hiring CCJ correctional officers.

150.   The County of Cook, the CCSO, and the CCJ breached that duty by engaging in willful and wanton conduct in hiring Officer Erika Aguirre.

151.   As a direct and proximate result of the County of Cook, CCSO, and CCJ's willful and wanton conduct in hiring Officer Aguirre, Officer Aguirre shot and severely injured Deisy and Enrique Jaimes.

## Count VIII – State Law Claim
## Cook County Sheriff's Breach of Duty in Failing to Terminate – Willful and Wanton Conduct

152.    Each of the Paragraphs of this Complaint is incorporated herein.

153.    The County of Cook, the CCSO, and the CCJ had a duty to refrain from willful and wanton conduct in allowing employees who are not fit for duty to continue in their employment with the CCSO and/or the CCJ.

154.    The County of Cook, the CCSO, and the CCJ breached that duty by engaging in willful and wanton conduct in failing to terminate and/or de-deputize and/or revoke the authorization to carry a service weapon by Officer Erika Aguirre.

155.    As a direct and proximate result of the County of Cook, CCSO, and CCJ's willful and wanton conduct in failing to terminate and/or de-deputize and/or revoke the authorization to carry a service weapon by Officer Aguirre, Officer Aguirre shot and severely injured Deisy and Enrique Jaimes.

## Count IX – Loss of Consortium

156.    Each of the Paragraphs of this Complaint is incorporated herein.

157.    At all times relevant Plaintiff Gloria Jaimes has been the spouse of Enrique Jaimes.

158.    As a result of one or more of the aforementioned willful and wanton acts or omissions or de facto practices, policies, and customs of the Defendants, Gloria Jaimes has been deprived, and in the future will continue to be deprived, of the support, society, companionship, and sexual relationship of her husband Enrique, causing her significant loss and damages.

**JURY DEMAND**

Plaintiffs Deisy Jaimes, Enrique Jaimes, and Gloria Jaimes hereby demand a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

RESPECTFULLY SUBMITTED,

/s/ Vince Field

Arthur Loevy
Jon Loevy
Michael Kanovitz
Vince Field
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900