# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

DEISY JAIMES, *et al.*,      )
      )
      Plaintiffs,      )    Case No. 17 C 8291
      v.      )
      )    Judge Jorge L. Alonso
COOK COUNTY, *et al.*,      )
      )
      Defendants.      )

## MEMORANDUM OPINION AND ORDER

In this civil rights case, Plaintiffs Deisy Jaimes, Enrique Jaimes, and Gloria Jaimes assert claims under 42 U.S.C. § 1983 and Illinois law against Cook County Sheriff Thomas Dart, a number of current and former Cook County Sheriff employees, and the Cook County Public Administrator, acting as special representative of the estate of Erika Aguirre. The claims stem from an incident in November 2015, when Aguirre broke into the Jaimes' home and shot Deisy and Enrique before turning the gun on herself and taking her own life. Defendants now move for summary judgment on all of Plaintiffs' claims. Defendants have also filed a *Daubert* motion to bar opinions offered by Plaintiffs' experts Roger Cowan and Richard Bard. For the reasons that follow, the Court grants Defendants' motion for summary judgment [187] and denies as moot Defendants' *Daubert* motion [208].

## BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

---

[1] Local Rule 56.1 outlines the requirements for introducing facts that parties would like considered on a motion for summary judgment. Where one party supports a fact with admissible evidence and the other party fails to controvert the fact with citation to admissible evidence, the Court deems the fact admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218-19 (7th Cir. 2015); *Ammons v. Aramark Uniform Servs., Inc.*, 368 F.3d 809, 817-18 (7th Cir. 2004). This does not, however, absolve the party putting forth the fact of the duty to support the fact with admissible evidence. *See Keeton v. Morningstar, Inc.*, 667 F.3d 877, 880 (7th Cir. 2012). Additionally, a responding party cannot create disputes of fact by relying upon

Plaintiff Deisy Jaimes and Defendant Erika Aguirre, a correctional officer for the Cook County Sheriff's Office ("CCSO"), began dating in 2011. (Pl.'s LR 56.1 Resp. ¶¶ 8, 26, ECF No. 197; Defs.' LR 56.1 Resp. ¶ 21, ECF No. 212.) The two eventually moved in together and got engaged. (ECF No. 212 at ¶ 21.) By 2013, however, their relationship had frayed. (*Id*. at ¶ 22.) For example, during one incident in the summer of 2014, Aguirre locked Deisy out of their home, threatened to kill Deisy, and claimed she would get away with it because she was a Cook County correctional officer. (*Id*. at ¶ 23.) On October 19, 2015, Aguirre and Deisy broke up. Deisy moved out of their home and stopped speaking to Aguirre. (*Id*. at ¶ 24.) On November 13, 2015, Aguirre texted Deisy asking Deisy to forgive her and take her back, but Deisy responded "no." (ECF No. 197 at ¶ 19.)

On November 15, 2015, Aguirre worked her regular shift at the Cook County jail, which ended at 10 p.m. (ECF No. 212 at ¶ 62.) After her shift, around 10:30 p.m., Aguirre exchanged text messages with her sister, Alicia Aguirre, about how Deisy was seen in public with another woman. (ECF No. 197 at ¶ 20.) Around this time or soon thereafter, Aguirre drove to the Jaimes' home in Bridgeview, Illinois, where Deisy lived with her parents, Plaintiffs Enrique and Gloria Jaimes, her sister, Marina Jaimes, and her brother, Jason Jaimes. (ECF No. 212 at ¶ 63; ECF No. 197 at ¶ 12.) Dressed in all black (including a black ski mask), Aguirre entered the Jaimes' home by breaking through a basement window. (*Id*. at ¶¶ 13-15.) Deisy's sister Marina heard the sound of glass breaking and went to the basement to investigate. As Marina walked down the stairs,

---

legal arguments, conclusions, or suppositions because these are not facts. *See Judson Atkinson Candies, Inc. v. Latini-Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008). The Court does not consider any facts that parties failed to include in their statements of fact because to do so would be rob the other party of the opportunity to show that the fact is disputed.

Aguirre immediately began shooting at her, and Marina fled from the basement. (*Id*. at ¶¶ 15, 18.) Aguirre then found Deisy in her basement bedroom and fired six shots at her, hitting Deisy in her left eye, head, shoulder, arms, and leg. (*Id*. at ¶ 16; ECF No. 212 at ¶ 64.) At that point, Enrique began coming down the basement stairs, and Aguirre turned and fired shots, hitting him in his head and torso. (ECF No. 212 at ¶ 64.) Aguirre then fatally shot herself. (*Id*. at ¶ 64.) Deisy and Enrique survived the shooting but suffered catastrophic injuries. (*Id*. at ¶¶ 65-67.)

When authorities arrived at the Jaimes' home, they found Aguirre's body in the kitchen. (*Id*. at ¶ 23.) She had a wallet containing various forms of identification, including her CCSO badge and her Firearm Owner Identification ("FOID") card. (ECF No. 197 at ¶ 43.) Authorities also found Aguirre's 9mm Glock 19 semi-automatic handgun near her body. (*Id*. at ¶ 25.)

Aguirre purchased the gun she used in the shooting in January 2011, pursuant to an official CCSO policy that requires all its correctional officers to purchase a firearm. (*Id*. at ¶ 44; ECF No. 212 at ¶¶ 1, 19.) Prior to January 2011, Aguirre had never owned a gun nor expressed interest in owning a gun. (ECF No. 212 at ¶ 19.) Although Aguirre personally purchased and owned her firearm, the CCSO provides correctional officers like Aguirre with funds that can be used to buy, among other things, their service weapons. (ECF No. 197 at ¶ 44; ECF No. 212 at ¶ 1.) By virtue of her CCSO credentials, Aguirre had the authority to carry her weapon while off duty, although she was not required to do so, per the CCSO firearms policy. (ECF No. 212 at ¶ 20.) In other words, as a CCSO correctional officer, Aguirre was exempted from having to separately obtain a concealed carry license to carry her firearm in public. (*Id*.)

Erika Aguirre worked as a correctional officer for the Cook County Sheriff's Office ("CCSO") from December 2010 until her death in November 2015. (ECF No. 197 at ¶¶ 8, 26.) At the time of the shooting, Aguirre was assigned to the jail's "Receiving, Trust and Classification

Division" ("RCDC"), a post which did not require her to carry a firearm. (*Id*. at ¶ 18.) Generally speaking, a CCSO correctional officer's typical duties include processing inmates, escorting them within the jail, and supervising distribution of meals to the cells. (*Id*. at ¶ 3.) Although CCSO correctional officers are deemed "peace officers" under Illinois law, correctional officers are not police officers; they do not have police powers, do not patrol as members of law enforcement, and are not considered "on duty" to respond to crimes in their presence even when technically off duty. (*Id*. at ¶ 7.) The CCSO does have its own police force, which is a separate entity within the CCSO. To become a CCSO police officer, a correctional officer must pass a promotional exam. Unlike correctional officers, CCSO police do have police powers, are considered "on duty" to respond to crimes even when technically off duty, and do not work inside the jail. (*Id*.)

While the CCSO requires its correctional officers to purchase a firearm, correctional officers are prohibited from bringing weapons into the Cook County jail. (*Id*. at ¶ 2.) Although there are some posts filled by correctional officers that require carrying a firearm, there is no evidence that Aguirre was ever assigned to such a post during her years as a correctional officer. (*Id*. at ¶ 18.) The CCSO offers at least two justifications for its policy of requiring its correctional officers to purchase firearms: (1) a correctional officer may be assigned to a post that requires a firearm,[2] and (2) under Illinois law, correctional officers must meet certain firearm qualification and training requirements, including 40 hours of firearms training each year. Although some other corrections facilities permit their correctional officers to borrow firearms or use department-issued firearms to complete the requisite firearm training, the CCSO requires each of its correctional officer to own a firearm instead. (*Id*. at ¶¶ 4-5.) Additionally, at least some CCSO correctional

---

[2] The CCSO employs approximately 3,000 correctional officers. (ECF No. 212 at ¶ 72.) Neither party states how many or what percentage of positions filled by correctional officers requires carrying a firearm, though Plaintiffs characterize it as a limited number of positions. (*Id*. at ¶ 5.)

officers have testified that they believe the firearm requirement was in place so that correctional officers could adequately protect themselves from former detainees or gang members they may encounter while off duty outside the jail. (*Id*. at ¶ 6.)

The CCSO firearms policy raises certain issues relevant to the instant motion, including what dangers were posed by the policy, what dangers were known or obvious, and what the CCSO did, if anything, to address these dangers. In relevant part, Plaintiffs offer expert testimony of corrections experts who opine that it is well-known in the field that correctional officers deal with elevated levels of stress that can, among other things, increase tension in their domestic relationships. (ECF No. 212 at ¶ 74.)[3] Plaintiffs experts also cite two incidents prior to the November 2015 shooting that involved a CCSO correctional officer shooting a spouse while off duty. (*Id*. at ¶ 83.) Plaintiffs also offer the testimony of a psychology expert, who explains that having a firearm in the home increases the likelihood of domestic violence and of homicide. (*Id*. at ¶ 79.)

 The CCSO requires its correctional officers to undergo initial firearms qualification and then annual requalification. These processes include training on the use, care, and storage of firearms but did not include any "psychological components" aimed at assessing whether the correctional officer was mentally fit to carry a firearm. (*Id*. at ¶ 82; ECF No. 197 at ¶ 38.) However, as recruits, all correctional officers attend 16 weeks of pre-service that covers a variety of topics, including use of firearms as well as mental health topics like coping skills and domestic violence. (ECF No. 197 at ¶ 33.) Additionally, the CCSO's hiring process includes, among other things, a "personality exam" that includes several psychological tests, as well as background checks of an

---

[3] Again, Defendants have moved to bar opinions offered by Plaintiffs' corrections experts, Roger Cowan and Richard Bard. For purposes of deciding the motion for summary judgment, the Court assumes the opinions offered by Cowan and Bard that are relevant to the issues raised by the parties are admissible.

applicant's job history and criminal history. (*Id*. at ¶ 30.) Also, after hiring correctional officers, the CCSO conducts routine background checks of its correctional officers' criminal history, driving abstract, and FOID records. (*Id*. at ¶ 47.)

Additionally, there are three CCSO programs relevant to the issues raised by the parties. First, the CCSO operates a "Peer Support Program" that is a network of volunteer CCSO employees who provide confidential support and assistance to CCSO employees experiencing personal and professional crises. (*Id*. at ¶ 62.) Second, the CCSO operates an "Employee Assistance Program," which also provides confidential counseling services by staff who are professionally certified in various fields, including psychology and social work. (*Id*. at ¶ 65.) Although participation in both programs is voluntary, correctional officers are given information about the programs and can be referred to the programs by other CCSO employees or concerned family members. (*Id*. at ¶¶ 61-67.)

Finally, the CCSO also operates an "Early Warning System." (*Id*. at ¶ 52; ECF No. 212 at ¶¶ 8-10.)[4] Following an investigation by the U.S. Department of Justice into conditions at the Cook County jail, the CCSO entered into a consent order that prompted the CCSO to implement the Early Warning System. (ECF No. 212 at ¶¶ 8-9.) The purpose of the Early Warning System was to ensure employees complied with the CCSO's use of force directives by establishing a system that identified CCSO employees involved in a higher than usual number of use of force incidents at the Cook County jail and, when appropriate, provide assistance or intervention to such employees. (*Id*. at ¶ 10.) Per the policy, when a correctional officer is involved in a certain number of use of force incidents, the correctional officer is flagged, supervisors review the correctional officer's conduct, and a supervisor meets with the flagged officer and, among other things, tells

---

[4] The CCSO's official name for this policy is the "Use of Force Alert and Early Intervention" policy. Plaintiffs refer to the policy as the CCSO's "Early Warning System," and the Court adopts that label.

the officer about the Employee Assistance Program. (*Id*. at ¶¶ 11-12.) Under the policy, supervisors were not specifically directed to ask questions about the flagged officer's personal lives or circumstances that could be creating mental distress. (*Id*.) In June 2015, Aguirre was flagged by the Early Warning System. CCSO supervisors reviewed the underlying incidents where Aguirre used force on Cook County jail inmates and found none of the incidents to be excessive. (ECF No. 197 at ¶ 59.) Pursuant to the Early Warning System policy, a CCSO supervisor met with Aguirre after she was flagged; the supervisor provided information about the Employee Assistance Program but did not ask any questions about stressors Aguirre may have been facing at work or in her personal life. (*Id*. at ¶ 60; 212 at ¶¶ 45-48.)

## LEGAL STANDARD

"The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Wackett v. City of Beaver Dam*, 642 F.3d 578, 581 (7th Cir. 2011). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate when the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to the party's case and on which that party will bear the burden of proof at trial." *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the nonmoving party." *Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court may not weigh conflicting evidence or make credibility determinations, but the party

opposing summary judgment must point to competent evidence that would be admissible at trial to demonstrate a genuine dispute of material fact. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011); *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). The court will enter summary judgment against a party who does not "come forward with evidence that would reasonably permit the finder of fact to find in [its] favor on a material question." *Modrowski v. Pigatto*, 712 F.3d 1166, 1167 (7th Cir. 2013). "Summary judgment is the proverbial 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).

## DISCUSSION

In their Second Amended Complaint, Plaintiffs assert the following claims: a § 1983 excessive force claim against Aguirre and the CCSO supervisor defendants[5] in their individual capacities (Count I); a § 1983 unreasonable seizure claim against Aguirre and the CCSO supervisor defendants in their individual capacities (Count II); a § 1983 failure-to-intervene claim against the CCSO supervisor defendants in their individual capacities (Count III); three § 1983 *Monell* claims against Cook County Sheriff Tom Dart in his official capacity[6] (Counts IV-VI); a state law negligent hiring, training, and supervising claim against Sheriff Dart in his official capacity (Count VII); three state law claims alleging willful and wanton conduct against Sheriff Dart in his official

---

[5] The Court refers to Defendants George Turner, Jeff Johnsen, Jaime Phillips, and Juanita Peterson collectively as the "CCSO supervisor defendants." The Court also refers to Defendant Cook County Public Administrator, acting as special representative for Aguirre's estate, simply as Aguirre.

[6] Claims brought against Sheriff Dart in his official capacity are really claims against Cook County. *See Bridges v. Dart*, 950 F.3d 476, 478 (7th Cir. 2020) (citing *Kentucky v. Graham*, 473 U.S. 159, 166, 105 S. Ct. 3099, 3105 (1985)). In discussing Plaintiffs' *Monell* claims, the Court sometimes refers to Defendant Sheriff Dart as the CCSO.

capacity (Counts VIII-X); and a state law claim for loss of consortium against Sheriff Dart in his official capacity (Count XI). Defendants move for summary judgment on all claims.

## I.    Section 1983 Claims

### A.    Individual-Capacity Claims

"Section 1983 creates a 'species of tort liability' for the 'deprivation of any rights, privileges, or immunities secured by the Constitution.'" *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S. Ct. 984, 988 (1976)). More specifically, Section 1983 states, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983. As the language suggests, to prevail on a § 1983 claim, Plaintiffs must prove (1) that they were deprived of a right secured by the Constitution, and (2) that "the deprivation was visited upon [them] by a person or persons acting under color of state law." *Buchanan-Moore v. County of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

Again, Plaintiffs bring § 1983 claims against Aguirre and the CCSO supervisor defendants in their individual capacities. In responding to the motion for summary judgment, Plaintiffs argue that when Aguirre broke into their home and shot them, she violated their right to be free from excessive force guaranteed by the Fourth Amendment and their due-process liberty interest in bodily integrity guaranteed by the Fourteenth Amendment. (*See* Pl.'s Corrected Resp. at 13, ECF No. 204.) Plaintiffs argue the CCSO supervisor defendants are also liable for these constitutional violations under § 1983 because they ignored Aguirre's troublesome behavior before the shooting and failed to intervene to stop Aguirre from acting. (*Id*. at 32-38.) Defendants argue, however, that

these claims must fail because there is insufficient evidence for a reasonable jury to find that Aguirre was acting under "color of law" when she committed the shooting. Defendants offer additional, alternative arguments as to why Plaintiffs' supervisory and failure-to-intervene claims must fail as well. The Court first addresses the "color of law" issue and then turns to Plaintiffs' claims against the CCSO supervisor defendants.

### 1.    Color of Law

In the § 1983 context, "[a]n action is not 'under color of state law' merely because it is performed by a public employee or officer; the action must be 'related in some way to the performance of the duties of the state office.'" *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (quoting *Barnes v. City of Centralia, Illinois*, 943 F.3d 826, 831 (7th Cir. 2019)); *see also Luce v. Town of Campbell*, 872 F.3d 512, 514 (7th Cir. 2017) ("A public employee's acts occur under color of state law when they relate to official duties.") The Seventh Circuit has explained that "action is taken under color of state law when it involves the misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Wilson v. Price*, 624 F.3d 389, 392 (7th Cir. 2010) (citations and quotations omitted). "Because under 'color' of law means under 'pretense' of law, any acts of officers in the ambit of their personal pursuits are plainly excluded." *Plaats v. Barthelemy*, 641 F. App'x 624, 627 (7th Cir. 2016). In other words, "Section 1983 does not cover disputes between private citizens, even if one happens to be an officer." *Id.*

Here, summary judgment is appropriate because no jury could find Aguirre was acting under color of law. It is undisputed that, while off-duty and dressed in a black (including a black ski mask), Aguirre forcibly broke into the Jaimes' home through a basement window, and without saying a word, opened fire on everyone she encountered. (ECF No. 197 at ¶¶ 13-15.) There is no

evidence showing that Aguirre's conduct was in any way related to the performance of her official duties. As a correctional officer, Aguirre's duties included processing and supervising inmates at the Cook County jail; Aguirre was not required to carry a firearm to perform her duties. (ECF No. 212 at ¶¶ 3, 18.) Moreover, there is no evidence that her actions constitute a "misuse" of authority she had by virtue of her position. Although Aguirre was considered a "peace officer" under Illinois law, it is undisputed Aguirre was not a police officer. She did not exercise police powers, and she was not considered to be "on duty" to respond to crimes even when she was technically off duty. (*Id.* at ¶¶ 7, 18.) Put differently, Plaintiffs point to no evidence showing that, on the night of November 15, 2015, Aguirre had any authority greater than an average citizen to enter a private home or use her firearm such that her actions could constitute a misuse of her authority. Further, there is no evidence showing Aguirre tried (or actually did) invoke her position as a correctional officer at any point on the night of November 15, 2015. In short, Aguirre acted as a private citizen, not a Cook County correctional officer.

Plaintiffs highlight certain facts—or reasonable inferences drawn from certain facts—that they argue preclude summary judgment on this issue, including (1) that Aguirre used her service weapon to commit the shooting; (2) that Aguirre "relied on the concealed carry authority" she had as a correctional officer to transport her firearm to the Jaimes' home; (3) that Aguirre had her CCSO badge and identification on her at the time of the shooting; and (4) that, in the summer of 2014, Aguirre threatened to kill Deisy and said she would get away with it because she was a correctional officer. (ECF No. 204 at 16-21.) Plaintiffs argue that a reasonable jury could rely on these facts and inferences drawn therefrom to find Aguirre was acting under color of law.

The Court disagrees. Regarding Aguirre's use of her service weapon in the shooting, it is undisputed that Aguirre personally owned the firearm and that she purchased it using her FOID

card. (ECF No. 197 at ¶¶ 39-40, 44.) While her employment at the CCSO may have required her to buy the firearm, (ECF No. 212 at ¶ 19), it was not through the authority of her position that she was able to obtain it. And the fact that a defendant uses her service weapon to injure a plaintiff is not enough, on its own, to render her acts "under the color of law." *See Gibson v. City of Chicago*, 910 F.2d 1510, 1519 (7th Cir. 1990) (finding defendant did not act under color of law even though he used his service weapon in fatal shooting); *see also Byrne v. City of Chicago*, 447 F. Supp. 3d 707, 711 (N.D. Ill. 2019) (finding defendant did not act under color of law even where plaintiff was shot with defendant's "CPD-issued service weapon").

Similarly, the fact that Aguirre had concealed carry privileges would not permit a jury to find she acted under the color of law. While neither party points to evidence bearing directly on how Aguirre actually brought her firearm into the Jaimes' home on November 15, 2015, the parties agree Aguirre had the ability to concealed carry by virtue of the fact that she was a correctional officer, (ECF No. 212 at ¶ 20), so a jury could reasonably infer Aguirre lawfully transported her firearm to the Jaimes' home because of her concealed carry privileges. However, this inference is immaterial because, again, Aguirre's criminal actions at the Jaimes' home were in no way related to the performance of her official duties nor could her actions even be characterized as a misuse of authority. The fact that Aguirre could have lawfully transported the gun to the Jaimes' home cannot blanket all of Aguirre's subsequent conduct in the color of law. *See e.g., Estate of Sims ex rel. Sims v. Cty. Of Bureau*, 506 F.3d 509, 516 (7th Cir. 2007) (finding defendant sheriff was not acting under color of law when he confronted decedent at her home and allegedly induced her fatal heart attack even though sheriff was on duty and had initially gone to decedent's home to pursue lawful investigation).

Likewise, the fact that Aguirre was found with her wallet containing her CCSO badge and identification is immaterial. Plaintiffs argue a jury could find Aguirre "brought her badge with her to the shooting as an invocation of her authority," but again, there is no evidence Aguirre displayed her CCSO badge or tried to invoke her position at any time during the break-in and shooting. (ECF No. 197 at ¶¶ 13-15.) *Compare Wilson*, 624 F.3d at 394 (finding defendant alderman did not act under color of law where he did not wear "any indicia of his position," invoke his office, or "identify himself as an alderman at any point during the confrontation") *with Pickrel v. City of Springfield, Ill.*, 45 F.3d 1115, 1118 (7th Cir. 1995) (finding defendant, who was off-duty police officer working as private security guard, could have acted under color of law where he was wearing police uniform and badge and had his police squad car parked nearby). For the same reason, Aguirre's threatening comments in the summer of 2014 (more than a year before the shooting) are immaterial because, again, there is no evidence that Aguirre actually attempted to invoke or rely on her position on the night of November 15, 2015. Plaintiffs contend that the fact that Aguirre made these comments and brought her CCSO badge with her evidence an *intention* to invoke her authority as a Cook County correctional officer, even if she never actually did so. They argue this is enough to at least get the question to a jury. Plaintiffs' argument fails to persuade because Seventh Circuit precedent teaches that a court looks at what a defendant actually did, not what the defendant could have done or may have thought about doing. *See e.g., Plaats*, 641 F. App'x at 627 (looking at "officer's actions" surrounding assault at issue to determine whether conduct was under color of law and relying on facts that defendant officer wore street clothes and hoodie, spoke only to call plaintiff's name, and did not identify himself but rather kept himself anonymous). And again, there is no evidence showing that Aguirre's position gave her any authority to enter a private home or use her firearm, so her criminal acts of breaking into the

Jaimes' home and shooting Deisy and Enrique cannot be viewed as misuse of any authority she had by virtue of her position. In other words, even if she intended to display her badge or invoke her authority as a correctional officer, she had no authority to actually invoke. *See Wilson*, 624 F.3d at 393; *Vanderlinde v. Brochman*, 792 F. Supp. 52, 55 (N.D. Ill. 1992) (finding two defendant firefighters who flashed their badges, proclaimed they were "the law in Oak Lawn," and beat up two individuals did not act under color of law because, as firefighters, they had no authority to act under the circumstances).[7]

Based on the foregoing, no reasonable jury could conclude that Aguirre was acting under color of state law. Aguirre was acting as a private citizen, and so she cannot be held individually liable under § 1983. Accordingly, the Court grants summary judgment in favor of Aguirre on Counts I and II.

### 2.      Supervisory and Failure-to-Intervene Claims

Defendants argue that Plaintiffs' claims against the CCSO supervisor defendants are necessarily doomed because Aguirre did not act under color of law. (ECF No. 189 at 7; ECF No. 214 at 6-7.) Plaintiffs fail to address this argument in their response (perhaps because they agree) and appear to defend their supervisory and failure-to-intervene claims only with the underlying assumption that Aguirre acted under color of law. (ECF No. 204 at 32-38.) The Court finds

---

[7] In a footnote, Plaintiffs suggest that a jury could infer that correctional officers like Aguirre had authority to use firearms while off duty for self-defense, based on the CCSO's policies of arming correctional officers and testimony from some correctional officers that their understanding of why the CCSO required them to purchase a firearm was to protect themselves outside the jail. (ECF No. 204 at 16 n.7.) Plaintiffs argue that this inference also supports a finding that Aguirre acted under color of law. The Court disagrees because, again, Plaintiffs make no argument nor point to any evidence suggesting that a CCSO correctional officer's right to self-defense is more expansive than or different from an ordinary citizen's right to self-defense, especially where the citizen has a concealed carry license. *See* 720 ILCS 5/7-1(a). So, the Court fails to see how this right to self-defense amounts to a "power . . . made possible only because the [correctional officer] is clothed with the authority of state law." *Barnes*, 943 F.3d at 831.

Plaintiffs' supervisory and failure-to-intervene claims ultimately fail because Plaintiffs do not point to evidence sufficient to prevail on these claims in light of the Court's finding on the color of law issue.

Again, Plaintiffs make clear that they bring their § 1983 individual capacity claims on a theory that Defendants' actions violated their rights under the Fourth and Fourteenth Amendments. (*See id*. at 13.) More specifically, Plaintiffs argue Defendants' actions violated their right to be free from excessive force guaranteed by the Fourth Amendment and their due-process liberty interest in bodily integrity guaranteed by the Fourteenth Amendment. *See Weinmann v. McClone*, 787 F.3d 444, 448 (7th Cir. 2015) (noting Fourth Amendment, which prohibits unreasonable seizures, provides an individual the right not to be seized through excessive force by a state actor); *see also Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003) (noting individual's liberty interest in bodily integrity guaranteed by Fourteenth Amendment's Due Process Clause is infringed by a "serious battery" committed by state actor). Importantly though, the Fourth and Fourteenth Amendments only restrain *government* action; they do not impose an obligation on a government actor to prevent acts of violence committed by a private individual. *See Pepper v. Vill. of Oak Park*, 430 F.3d 805, 809 (7th Cir. 2005) ("The protections of the Fourth Amendment apply only to governmental action and are 'wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official.'") (quoting *United States v. Jacobsen*, 466 U.S. 109, 113-14, 104 S. Ct. 1652, 1656 (1984)); *see also LaPorta*, 988 F.3d at 987-88 ("Nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors.") (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 195, 109 S. ct. 998, 1003 (1989)).

It follows then that, because Aguirre was acting as a private individual when she shot Plaintiffs, the failure of her CCSO supervisors to prevent the shooting cannot amount to a constitutional violation. Plaintiffs do not argue—nor do they put forth evidence showing—that any of the CCSO supervisor defendants participated in the shooting or had knowledge of the shooting such that their conduct could amount to a Fourth Amendment violation. *Pepper*, 430 F.3d at 809. And while there are two limited exceptions to the general rule that a state actor has no duty under the Fourteenth Amendment to protect against private acts of violence, Plaintiffs do not argue nor put forth evidence showing that the CCSO supervisor defendants' conduct can fit into either exception. *See LaPorta*, 988 F.3d at 988-89 (discussing exceptions recognized in *DeShaney*).

In essence, Plaintiffs argue that the CCSO supervisor defendants "were on notice that Aguirre presented substantial risks of violence" but failed to take any action. (ECF No. 204 at 32.) In support, Plaintiffs offer evidence of two verbal altercations Aguirre got into with certain CCSO supervisors and a fellow correctional officer and a number of on-duty incidents where Aguirre used force to subdue Cook County jail detainees (none of which was deemed to be excessive uses of force). Plaintiffs argue that, based on these events, the CCSO supervisor defendants should have investigated Aguirre's fitness for duty or reported concerns to others at the CCSO and, if they had done so, Aguirre's firearm could have been taken away either while an investigation took place or upon a finding that Aguirre was unfit for duty. (ECF No. 204 at 32-38.) In essence, Plaintiffs argue the CCSO supervisor defendants were deliberately indifferent in turning a blind eye to warning signs that Aguirre could act out violently and did nothing to adequately investigate or take her firearm away from her. But again, the CCSO supervisor defendants' inaction in the face of the possibility that Aguirre may commit violence in her private life cannot amount to a violation of the Fourth Amendment or Fourteenth Amendment. *See Pepper*, 430 F.3d at 810 ("Under any

theory, to be liable under § 1983, the individual defendant must have *caused or participated in the constitutional deprivation*.") (quotations omitted) (emphasis added).

The Seventh Circuit's recent decision in *LaPorta*, which was decided after the parties completed briefing in this case, supports the Court's finding here. Based on the assumption that Aguirre acted under color of law, the parties discuss the viability of Plaintiffs' supervisory and failure-to-intervene claims under familiar analytical frameworks. (ECF No. 189 at 7-10; ECF No. 204 at 32-38.) For Plaintiffs' supervisory claims, the parties agree that Plaintiffs must prove each supervisor knew about the conduct at issue and facilitated it, approved it, condoned it, or turned a blind eye for fear of what the supervisor might see. *See Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001). For Plaintiffs' failure-to-intervene claims, the parties agree that Plaintiff must prove that each supervisor had reason to know that a constitutional violation was being committed by a law enforcement official and that the supervisor had a realistic opportunity to intervene to prevent the harm from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). However, what *LaPorta* makes clear is that, even assuming the Plaintiffs presented sufficient evidence to satisfy these frameworks, Plaintiffs still fail to show the requisite constitutional violation to prevail on a § 1983 claim.

In *LaPorta*, the plaintiff was shot by an off-duty Chicago police officer, and the parties agreed that the police officer was not acting under color of law at the time of the shooting. 988 F.3d at 987. Plaintiff brought a § 1983 *Monell* claim against the City of Chicago and argued that the City had a number of policies that caused the off-duty police officer to shoot the plaintiff, thereby violating the plaintiff's Fourteenth Amendment right. *Id*. at 983. In overturning a jury verdict for the plaintiff, the Seventh Circuit explained that the plaintiff's claim failed as a matter of law because the plaintiff failed to show a constitutional violation; the Seventh Circuit said the

City could not have violated plaintiff's Fourteenth Amendment right because it had no duty to protect the plaintiff from a private act of violence. *Id*. at 987-92 (citing *DeShaney* for contours of Fourteenth Amendment right). Importantly, the Seventh Circuit rejected the plaintiff's argument that they had proven a constitutional violation through the *Monell* framework, i.e., that because they proved the City's policies caused the shooting, the City violated plaintiff's Fourteenth Amendment rights. The Seventh Circuit explained that plaintiff's argument, and the case law supporting it, "reflect a basic misunderstanding of the relationship between *Monell* and *DeShaney*" because the two "are not competing frameworks for liability." *Id*. at 990. While *DeShaney* "addressed the substance of the constitutional right to due process," *Monell* did not; rather, *Monell* "addressed the issue of who can be sued under [§ 1983]." *Id*. The Seventh Circuit concluded that "because [plaintiff] was not deprived of his right to due process [because the City had no constitutional duty to stop a private act of violence], the City cannot be held liable for his injuries under § 1983—and that is so *even if* the requirements of *Monell* are established." *Id*. at 991.

Although *LaPorta* addressed only *Monell* claims, the logic extends with equal force to supervisory and failure-to-intervene claims. Like *Monell*, the analytical frameworks laid out in cases like *Chavez* (for supervisory claims) and *Yang* (for failure-to-intervene claims) address who can be sued under § 1983 and not the substance of a constitutional right. As discussed above, Plaintiffs fail to show that the CCSO supervisor defendants' conduct can amount to a constitutional violation, so the Plaintiffs' proffered evidence relating to supervisory and failure-to-intervene liability is insufficient to escape summary judgment.[8] Accordingly, the Court grants summary judgment in favor of the CCSO supervisor defendants on Counts I, II, and III.

---

[8] Although Plaintiffs do not explicitly make the argument, they cite the Seventh Circuit's decision in *Gibson* in discussing supervisory liability. (ECF No. 204 at 32.) It is true that *Gibson* reversed a grant of summary judgment on a supervisory claim (and a *Monell* claim) even where it found that a defendant officer did not act under color of law. 910 F.2d at 1523. However, in *LaPorta*, the Seventh Circuit clarified that its decision

Finally, Defendants point out that Plaintiffs appear to sue the CCSO supervisor defendants in their official capacities, and Defendants argue any official capacity claims against the CCSO supervisor defendants should be dismissed as redundant. (*See* ECF No. 189 at 14; *see also* 2d Am. Compl. at ¶¶ 20, 22, 25, Ex. 1, ECF No. 32.) Plaintiffs fail to respond to this argument, and in doing so, waive any official capacity claims against the CCSO supervisor defendants. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). Waiver aside, the Court agrees with Defendants; alleging an official capacity claim against a defendant is merely another way of alleging the claim against the entity for which the official is an agent. *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099 (1985). Because Plaintiffs name Sheriff Dart as a defendant in his official capacity, any official capacity claims against the CCSO supervisor defendants are redundant and thus dismissed. *See e.g., Reed v. Illinois*, 798 F. App'x 932, 934 n.1 (7th Cir. 2020); *see also Cruz v. Dart*, No. 11 C 00630, 2012 WL 5512275, at *7 (N.D. Ill. Nov. 13, 2012).

## B.     *Monell* Claims

The Court now turns to Plaintiffs' *Monell* claims against Defendant Sheriff Dart. The governing legal principles are well established. Because § 1983 does not permit *respondeat superior* liability, a local governing body like the CCSO can only be held liable when it has a policy that causes a constitutional violation. *Monell v. Dept. of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 2036 (1978); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009). To prevail on a so-called *Monell* claim, a plaintiff must prove that the

---

in *Gibson* was attributable to the "unusual procedural posture" of the case, which necessitated that it review the plaintiff's *Monell* and supervisory claims under a Rule 12(b)(6) standard. 988 F.3d at 991-92. The Seventh Circuit reversed in *Gibson* because it had found the plaintiff had alleged enough facts to show a Fourteenth Amendment violation under *DeShaney*'s "state-created dangers" exception. *Id.* Reading *LaPorta* and *Gibson* together, the Court can only conclude that judgment on the supervisory claim in *Gibson* was reversed for the same reason. *See Gibson*, 910 F.2d at 1523 (stating that supervisory claim "stands on similar ground to the municipal liability claim").

constitutional violation was caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well-settled; or (3) an official with policy-making authority. *Thomas*, 604 F.3d at 303. Where the policy at issue does not directly violate a plaintiff's rights but causes another to do so, a plaintiff must demonstrate the governing body's action was taken with "deliberate indifference." *LaPorta*, 988 F.3d at 987; *see also Gable v. City of Chicago*, 296 F.3d 531, 537 (7th Cir. 2002). Additionally, a *Monell* plaintiff must show that the government entity's action was the "moving force" behind the constitutional violation; put differently, the plaintiff must show a "direct causal link" between the challenged municipal action and the constitutional violation. 988 F.3d at 987.

Plaintiffs argue there is sufficient evidence to support a *Monell* claim against Defendant Sheriff Dart based on three separate CCSO policies or practices: (1) the CCSO's policy of requiring all its correctional officers to purchase and own a firearm; (2) the CCSO's practice of failing to maintain a proper early warning system to flag problematic correctional officers like Aguirre; and (3) the failure of an alleged CCSO policymaker, Defendant Director George Turner, to order Aguirre to undergo a fitness for duty exam and to suspend her right to carry her firearm. (ECF No. 204 at 23-31.)

*LaPorta*—which again, was decided after the parties completed briefing—makes clear Plaintiffs' latter two *Monell* claims fail as a matter of law. Like the supervisory and failure-to-intervene claims, Plaintiffs' *Monell* claims based on the CCSO's failure to maintain a proper early warning system and on a CCSO policymaker's failure to investigate and suspend Aguirre's firearm privileges depend on a finding that Aguirre was acting under color of law at the time of the shooting because, again, Defendants' failure to prevent private acts of violence cannot amount to a

constitutional violation. So even assuming the latter two claims meet *Monell*'s policy requirements, they still must fail. *See LaPorta*, 988 F.3d at 983 (finding *Monell* claims based on policies of failing to have an "early warning system" to identify problematic officers, of failing to adequately investigate and discipline officers who engage in misconduct, and of perpetuating a "code of silence" failed as a matter of law); *see also King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) ("It is well established that there can be no municipal liability based on [a] policy under *Monell* if the policy did not result in a violation of [the plaintiff's] constitutional rights").[9] Notably, the Court gave the parties a chance to address *LaPorta* after they had finished briefing Defendants' motion for summary judgment, and Plaintiffs admit the viability of their latter two *Monell* claims depend on a finding that Aguirre acted under color of law. (*See generally* Defs.' Mot. to Cite Add'l Auth., ECF No. 230; *see also* Pl.'s Resp. to Defs.' Mot. of Add'l Auth. at 7-8, ECF No. 236.)

That leaves Plaintiffs' first *Monell* claim. Plaintiffs argue the CCSO's policy of requiring every correctional officer to purchase a firearm amounts to a "state-created danger" that caused Plaintiffs' injuries, thereby violating their Fourteenth Amendment rights. Plaintiffs are correct that a state-created danger substantive due process claim can survive the Court's finding that Aguirre did not act under color of law. *See LaPorta*, 988 F.3d at 991. As mentioned above, in *DeShaney*, the Supreme Court held that the Due Process Clause did not require a government entity like the CCSO to protect "the life, liberty, and property of its citizens against invasion by private actors."

---

[9] Plaintiffs' Second Amended Complaint also includes *Monell* claims based on the CCSO's alleged policies and practices of maintaining a "code of silence" (Count VI) and of failing to investigate and discipline CCSO correctional officer misconduct (Count IV). (*See* 2d Am. Compl. at ¶¶ 158-160, 164-166.) Defendants moved for summary judgment on these counts, and Plaintiffs did not defend these *Monell* claims but instead argued the three policies or practices identified above could support a *Monell* claim. Defendants correctly point out Plaintiffs' failure to respond to Defendants' arguments amounts to waiver. *See Nichols*, 755 F.3d 594. Waiver aside though, these *Monell* claims fail because they also depend on a finding that Aguirre acted under color of law.

489 U.S. at 195-96 (stating the Due Process Clause's "purpose was to protect the people from the State, not to ensure that the State protected them from each other"). However, courts have read *DeShaney* to specifically carve out two situations where the state can violate an individual's substantive due process rights, one of which is where the state affirmatively creates a danger that injures the individual. *See DeShaney*, 489 U.S. at 201 ("While the State may have been aware of the dangers that [plaintiff] faced in the free world, it played no part in their creation, nor did it do anything to render him any more vulnerable to them."); *see also LaPorta*, 988 F.3d at 988 (citing this language from *DeShaney* as providing basis for the so-called "state-created danger" exception); *Buchanan-Moore v. Cty. of Milwaukee*, 570 F.3d 824, 827 (7th Cir. 2009).

In order to prevail on a substantive due process claim under a state-created danger theory, Plaintiffs must show: (1) that the CCSO, by its affirmative acts, created or increased a danger that Plaintiffs faced; (2) that the CCSO's failure to protect Plaintiffs from the danger was the proximate cause of their injuries; and (3) that the CCSO's conduct "shocks the conscience." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 819 (7th Cir. 2007); *Est. of Her v. Hoeppner*, 939 F.3d 872, 876 (7th Cir. 2019) (setting forth same test); *but see Weiland v. Loomis*, 938 F.3d 917, 920-21 (7th Cir. 2019) (criticizing three-part test as allowing for liability broader than that permitted by *DeShaney*). Importantly, "[t]he state-created danger exception is a narrow one," and the Seventh Circuit has stressed liability under a state-created danger theory has only been found under "rare and often egregious" circumstances. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 917 (7th Cir. 2015). Ultimately, Plaintiffs fail to put forth sufficient evidence needed to prove the CCSO's policy amounts to the sort of egregious conduct that can form the basis of a state-created danger claim.

As a threshold issue, Defendants' point out that Plaintiffs raise their state-created danger theory for the first time in their response to Defendants' motion for summary judgment. It is true that Plaintiffs' Second Amended Complaint does not formally lay out this theory as a separate count alleging a *Monell* claim. However, Defendants do not show that Plaintiffs are seeking to alter facts alleged in the Second Amended Complaint to support this new legal theory, nor do Defendants argue they have suffered any prejudice. So, Defendants fail to show why the Court should not consider the merits of Plaintiffs' claim. *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852, 859-60 (7th Cir. 2017).

That being said, the briefing gives relatively short shrift to discussing the sufficiency of the evidence to support Plaintiffs' state-created danger claim. Notably, in arguing that a jury could find in their favor, Plaintiffs do not substantively address whether there is evidence to satisfy *Monell*'s requirements, discussed above, nor do they address whether there is evidence to satisfy the state-created danger causation requirement, and there is reason to doubt whether Plaintiffs can prove some of these elements. For example, again, a state-created danger claim requires a plaintiff show the danger was the proximate cause of the injury, and the Seventh Circuit has clarified this requires a plaintiff show the danger at issue was "limited in both time and scope." *Buchanan-Moore*, 570 F.3d at 828 (quoting *Reed v. Gardner*, 986 F.2d 1122, 1127 (7th Cir. 1993)). Here, as Plaintiffs present their claim, the danger of arming CCSO correctional officers appears impermissibly indefinite; indeed, Aguirre had a firearm for nearly five years before she injured Plaintiffs. *See id.* (rejecting state-created danger claim where defendants released a mentally-ill man from custody who, days later, fatally shot plaintiffs' family member because danger was "indefinite" and "existed without temporal boundaries"); *cf. Martinez v. State of Cal.*, 444 U.S. 277, 285, 100 S. Ct. 553, 559 (1980) (finding that parolee who murdered plaintiff five months after

being paroled was "too remote" to provide a § 1983 cause of action against parole officer). But the Court does not base its decision on these unaddressed issues. The parties do discuss, albeit in a somewhat cursory fashion, the first and third elements of a state-created danger claim, i.e., whether the CCSO policy created or increased a danger to Plaintiffs and whether the CCSO's conduct "shocks the conscience."

Regarding the first element, again, Plaintiffs argue the CCSO's policy of arming its correctional officers created or increased a danger that correctional officers would misuse their firearms to harm individuals like Plaintiffs. In support of their argument, Plaintiffs point to the testimony of Richard Bard, a corrections expert, who opines that it is well-known that correctional officers deal with elevated levels of stress that impacts their mental health and that can increase tension in their domestic relationships. (ECF No. 212 at ¶ 74.) Plaintiffs also offer the testimony of Dr. Pearson, a psychology expert, who explains that research shows having a firearm in the home increases the likelihood of domestic violence and of homicide of a family member. (*Id*. at ¶ 79.)[10] Further, Plaintiffs also offer evidence showing the CCSO firearms policy was the only reason Aguirre possessed a firearm. (*Id*. at ¶ 19 (citing evidence that Aguirre had never owned a gun nor expressed interest in owning a gun prior to obtaining one pursuant the CCSO policy.) Even assuming this evidence is sufficient to find that the CCSO policy here created or increased a danger, Plaintiffs' claim still must fail because the evidence does not permit a jury to find that the

_____

[10] In making their argument, Plaintiffs also point to evidence from their experts discussing a known, elevated risk of suicide that correctional officers face due to work stressors. (*See* ECF No. 212 at ¶¶ 75-78, 80.) This evidence is ultimately irrelevant because Plaintiffs are seeking to recover for the injuries Aguirre inflicted upon *them*, not for the injuries she inflicted upon herself (nor can Plaintiffs recover damages for Aguirre's suicide). Plaintiffs point to no evidence linking suicide to domestic violence in such a way that would permit a fact finder to conclude that a correctional officer's elevated risk of suicide means that the correctional officer is also more likely to commit acts of domestic violence. Further, the Court notes that Dr. Pearson's testimony is the only evidence linking possession of a firearm to an increased chance of domestic violence.

CCSO's conduct here "shocks the conscience." *Jackson v. Indian Prairie Sch. Dist. 204*, 653 F.3d 647, 654 (7th Cir. 2011)

Turning to the third element, although what shocks the conscience "lacks precise measurement," only conduct falling towards the more culpable end of the tort law spectrum of liability can qualify. *King*, 496 F.3d at 818-19; *see also Jackson*, 653 F.3d at 654-55. Negligence or even gross negligence is not enough; rather, a plaintiff must show "a culpable state of mind equivalent to deliberate indifference . . . [elsewhere described as] criminal recklessness." *Est. of Her*, 939 F.3d at 876; *see also Slade v. Bd. of Sch. Directors of City of Milwaukee*, 702 F.3d 1027, 1032 (7th Cir. 2012) (describing relevant standard as "recklessness" and noting open question as to whether the relevant standard is one of criminal recklessness or civil recklessness). Where, as here, "the circumstances permit public officials the opportunity for reasoned deliberation in their decisions," their conduct shocks the conscience when it demonstrates a deliberate indifference or recklessness to the rights of the plaintiff. *King*, 496 F.3d at 819. In other words, a public entity's policy can shock the conscience where it poses a serious risk that is obvious or actually known to the public entity, and where the public entity fails "to avert the risk though it could easily have been averted." *Slade*, 702 F.3d at 1032. "Only the most egregious official conduct will satisfy this stringent inquiry." *Jackson*, 653 F.3d at 654.

In their response brief, Plaintiffs fail to discuss substantively how the evidence in the record supports a finding that the CCSO acted with the requisite culpability. Nevertheless, Plaintiffs highlight certain evidence in their LR 56.1 statement of additional facts that is relevant to this issue. In addition to the known risks facing correctional officers discussed above, Plaintiffs offer the testimony of another corrections expert, Roger Cowan, who testifies that prior to Aguirre shooting Plaintiffs, there were two other incidents where a correctional officer shot a spouse while

off duty. (ECF No. 212 at ¶ 83.)[11] Based on this evidence, a reasonable jury could find that it was obvious or actually known to the CCSO that its correctional officers could misuse firearms to harm individuals like Plaintiffs. Regarding whether the CCSO failed to take steps to avert this danger, Plaintiffs note that the firearms qualification and annual requalification for CCSO correctional officers did not include any "psychological components" aimed at ensuring correctional officers are mentally fit to possess their firearms. Plaintiffs also note that, when a correctional officer was flagged by CCSO's "Early Warning System," supervisors were required to speak to the flagged officer but were not directed to ask the officer about mental health or sources of stress. Based on these facts, Plaintiffs' expert Cowan opines that the CCSO did not take certain basic steps to minimize the risks posed by its policy of arming its officers. (*Id*. at ¶ 82.)

Defendants raise other evidence in their LR 56.1 statement of facts showing that, even assuming the danger posed by arming correctional officers was known or obvious, the CCSO took several steps to address or minimize the risk that correctional officers would misuse their firearms. For instance, all CCSO correctional officer attend 16 weeks of pre-service training as recruits that covers many topics, including proper use of firearms as well as mental health topics like coping skills and domestic violence. (ECF No. 197 at ¶ 33.) CCSO correctional officers are also required to train on the use, care, and storage of their firearm and requalify annually in the use of their firearm. (*Id*. at ¶ 38.) Additionally, the CCSO's hiring process includes, among other things,

---

[11] Cowan actually mentions five shooting incidents involving correctional officers, but only two incidents involve a domestic violence shooting like the one at issue here. As for the other incidents, one involved a correctional officer shooting a stranger, and the other two involved a correctional officer committing or attempting to commit suicide (one of which occurred in 2019, well after the events giving rise to the instant suit). Defendants point out that neither domestic shooting involved the use of a service weapon, though Plaintiffs described the weapons used as "CCJ-required weapons." Plaintiffs do not explain what this means nor do they provide surrounding details of these incidents.

conducting a personality exam,[12] a polygraph exam, interviews with previous employers, and background checks of the applicant's criminal history and job history. (*Id*. at ¶ 30.) The CCSO also conducts routine background checks of its correctional officers' criminal history, driving abstract, and FOID records. (*Id*. at ¶ 47.) Further, as a matter of policy, the CCSO requires its correctional officers to comply with all laws, ordinances, and regulations, and the CCSO also requires its officers to notify CCSO entities if they are arrested, indicted, or convicted of a felony or misdemeanor. (*Id*. at ¶¶ 49-50.)

Specifically relating to mental health, the CCSO operates a "Peer Support Program" and an "Employee Assistance Program." (*Id*. at ¶¶ 61-67.) The Peer Support Program is a network of volunteer members of the CCSO who provide confidential support and assistance to CCSO employees experiencing personal or professional crises. (*Id.* at ¶ 62.) The Peer Support Program offers a variety of services, and although participation is voluntary, a coworker or family member can refer a correctional officer to the Peer Support Program, who will then contact the correctional officer. Although the Peer Support Program is confidential for any CCSO employee who chooses to participate, the volunteer members are obligated to disclose information under certain circumstances, including when an employee threatens to harm another person. (*Id*. at ¶ 64.) The Employee Assistance Program provides confidential counseling services by staff who are professionally certified in psychology, social work, or other human services fields. (*Id*. at ¶ 65.) The Employee Assistance Program is intended to provide counseling for correctional officers dealing with certain issues, including marital or family problems, separation and divorce, family

---

[12] Defendants appear to characterize the personality exam as a "psychiatric examination," but Plaintiffs object to this characterization. Plaintiffs do not attempt to explain what a psychiatric examination is or what it would entail, but the records offered in support of this fact reflect a third-party company conducted a "personality evaluation" of Aguirre, which included several psychological tests, and that the third-party highly recommended Aguirre be hired by the CCSO.

violence, general stress, or grief. Correctional officers can refer themselves to the Employee Assistance Program or be referred by a supervisor under certain circumstances. (*Id*.at ¶ 66.) Correctional officers are periodically given information about the Peer Support Program and Employee Assistance Program. (*Id*. at ¶¶ 61, 67.)

In light of measures the CCSO takes in its hiring process, firearms training, and programs aimed at addressing the mental health of its correctional officers, no reasonable jury could find that the CCSO was deliberately indifferent to the danger that its correctional officers would misuse their weapons to commit acts of domestic violence. At bottom, Plaintiffs offers evidence and expert testimony showing that the the CCSO could have had different policies and procedures or more procedures in place to better minimize the danger its firearms policy created, but even though the Court must view the evidence in a light most favorable to Plaintiffs, it is not free to ignore the evidence put forward by Defendants of the steps the CCSO took to prevent or minimize the danger posed by its policy. *Jackson*, 653 F.3d at 654-66 (granting summary judgment on third element of state-created danger claim after analyzing facts both supporting and weighing against a finding that defendant's conduct shocked the conscience). It is true that the CCSO likely could have done more to prevent its correctional officers from misusing their weapons while off duty, but again, showing that the CCSO policy was negligent—or even grossly negligent—is not enough. *Id*. (finding that "although the defendants' actions may well have been short-sighted, flawed, negligent, and tortious, they do not satisfy the standard for finding a constitutional violation").

In support of their state-created danger claim, Plaintiffs rely heavily on *Ross v. United States*, 910 F.2d 1422, 1431 (7th Cir. 1990), and the differences between *Ross* and this case are telling. In *Ross*, the plaintiff brought a state-created danger claim against Lake County after her 12-year-old son drown in Lake Michigan. *Id*. at 1425-29. Plaintiff alleged that the county had an

official policy of prohibiting unauthorized people from attempting to rescue someone who was in danger of drowning. The rationale behind the policy was to prevent would-be rescuers from also drowning and to delegate the duty of rescuing swimmers to one authorized entity, a nearby municipal fire department. *Id*. at 1429. Shortly after plaintiff's son fell into Lake Michigan and began drowning, the county's deputy sheriff prevented a number of people, including lifeguards, firefighters, and private scuba-divers, from attempting to rescue the boy, pursuant to the county's policy. *Id*. at 1424-25. In reversing dismissal of the plaintiff state-created danger claim based on the county's policy, the Seventh Circuit found that the defendant's "policy not only tolerated a risk that someone might drown but actually contemplated that some persons would die for the sake of preventing harm to private rescuers." *Id*. at 1431. Here, the evidence does not show that the CCSO's firearms policy contemplated or tolerated the risk that some correctional officers would misuse their firearms to commit acts of domestic violence. To the contrary, the evidence shows the CCSO took various steps to prevent that risk from occurring. As such, no reasonable jury could find that the CCSO's policy was so egregious as to fit into the "narrow" state-created danger exception and amount to a constitutional violation. *Est. of Her*, 939 F.3d at 876.

Finally, in support of their claim, Plaintiffs also argue that the rationales behind the CCSO's policy of arming its correctional officers do not justify the danger posed by the policy. Plaintiffs argue that the CCSO could meet its needs through a less dangerous policy, such as providing department-owned firearms for its correctional officers to use when needed instead of requiring every correctional officer to personally possess a firearm. (ECF No. 204 at 24-25.) Again, the relevant question here is whether the CCSO acted recklessly or with deliberate indifference, not whether their policy was sufficiently wise. *See Slade*, 702 F.3d at 1031 (rejecting plaintiffs' state-created danger claim based on student drowning on school field trip and noting

defendant school district could have had different policies or allocated more resources to ensure student safety but that "federal courts are not in a position to second-guess such judgments"). Simply put, "the existence or possibility of other better policies which might have been used does not necessarily mean that the [CCSO] was being deliberately indifferent" or reckless. *See Butera v. Cottey*, 285 F.3d 601, 608-09 (7th Cir. 2002) (quoting *Frake v. City of Chicago*, 210 F.3d 779, 782 (7th Cir. 2000)) (affirming summary judgment and finding plaintiff failed to show defendant sheriff acted with deliberate indifference); *see Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (citing *Frake* and affirming summary judgment on *Monell* claim against county defendant). In light of the alternatives presented by Plaintiffs, the CCSO's firearms policy may be negligent or even grossly negligent, but Plaintiffs fail to show it shocks the conscience. Accordingly, the Court grants summary judgment in favor of Defendant Sheriff Dart on all of Plaintiffs' *Monell* claims.

## II.    State Law Claims

Defendants also move for summary judgment on Plaintiffs' remaining state law claims against Sheriff Dart (Count VII for negligent hiring, training, and supervising; Count VIII-X for willful and wanton conduct; and Count XI for loss of consortium) or, in the alternative, move to dismiss the state law claims pursuant to 28 U.S.C. § 1367(c)(3). Because the Court has resolved all federal claims before it and has not yet expended significant effort on the merits of the state law claims, the Court exercises its discretion and dismisses without prejudice Counts VII through XI. *See Burritt v. Ditlefsen*, 807 F.3d 239, 252 (7th Cir. 2015) ("The general rule, when the federal claims fall out before trial, is that the [district court] should relinquish jurisdiction over any supplemental . . . state law claims in order to minimize federal judicial intrusion into matters of purely state law." (quoting *Carr v. CIGNA Secs., Inc.*, 95 F.3d 544, 546 (7th Cir. 1996)).

## CONCLUSION

For the foregoing reasons, the Court grants Defendants' motion for summary judgment [187] and denies as moot Defendants' *Daubert* motion [208].

**SO ORDERED.**                                        **ENTERED: May 3, 2021**

_____
**HON. JORGE ALONSO**
**United States District Judge**